# In re Y-B-, Respondent

*Decided February 19, 1998*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) An asylum applicant does not meet his or her burden of proof by general and meager testimony.

(2) Specific, detailed, and credible testimony or a combination of detailed testimony and corroborative background evidence is necessary to prove a case for asylum.

(3) The weaker an applicant's testimony, the greater the need for corrobative evidence.

FOR THE RESPONDENT: Robert J. Sidi, Esquire, New York, New York

BEFORE: Board En Banc: DUNNE, Vice Chairman; VACCA, HEILMAN, HURWITZ, VILLAGELIU, COLE, MATHON, and JONES, Board Members. Concurring Opinion: HOLMES, Board Member, joined by FILPPU, Board Member. Dissenting Opinion: ROSENBERG, Board Member, joined by SCHMIDT, Chairman, and GUENDELSBERGER, Board Member.

VACCA, Board Member:

In a decision dated September 18, 1996, an Immigration Judge found the respondent deportable as charged under section 241(a)(1)(B) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(1)(B) (1994), denied his applications for asylum and withholding of deportation pursuant to sections 208(a) and 243(h) of the Act, 8 U.S.C. §§ 1158(a) and 1253(h) (1994), but granted him the privilege of voluntary departure under section 244(e) of the Act, 8 U.S.C. § 1254(e) (1994). The respondent has appealed. The appeal will be dismissed.

The respondent is a 29-year-old native and citizen of Mauritania who bases his request for asylum in the United States on his fear of persecution by white Maurs on account of his race. He testified that he is from a town in Mauritania that is about 17 kilometers from Mbagme, the city where he applied for a national identity card, a photocopy of which he presented as evidence. The respondent stated that he worked as a farmer and herder in his native country. According to the respondent, he was outside of town with his cousin and friends one day when the military came, along with black Maurs, who know which people have the most animals in the town. The respondent related that the black Maurs showed the white Maurs the animals and the

white Maurs wanted to take them. He explained that the white Maurs killed his cousin, tied the respondent up, and told the black Maurs to take the animals. The respondent stated that he was then beaten, threatened, and taken into town to his house. According to his testimony, they took his father, tied him up, threw him into the car in which the respondent was held, and searched the house for other things. The respondent stated that he and his father were beaten with belts. He testified that his uncle was also captured, and he and his uncle were taken to Mbagme, while his father was taken to Elega. The respondent related that he never saw his father again.

The respondent explained that this arrest occurred on September 9, 1989, and he was released on September 30, 1989. He further stated that he was released because a lot of prisoners were dying and the captors did not want them to die in Mauritania; they were told to go die in Senegal. The respondent indicated that he and his uncle crossed with a lot of other black people into Senegal, where they met people from the Red Cross. According to his testimony, he went through a lot of refugee camps looking for his family, arriving at the Hore Fondue camp first, and settling at the Mboumba refugee camp, where he lived for 2 years and 4 months. The respondent stated that his uncle was at the same refugee camp.

The respondent reported that his mother and his paternal grandmother were forced to cross into Senegal on the day that he was arrested and, with the aid of the Red Cross, he found them at the Mboumba refugee camp after he arrived in Senegal. The respondent testified that he lived in Dhaka for 1 year and that after he left Senegal, he went to Mali, the Ivory Coast, Burkina Faso, Niger, and Nigeria. According to the respondent, he stayed in Nigeria for about 1 month and then came to the United States. The respondent asserted that if he were returned to Mauritania, he would be jailed or killed.

We agree with the Immigration Judge that the respondent has failed to demonstrate past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *See INS v. Elias-Zacarias*, 502 U.S. 478 (1992); *Matter of S-P-*, 21 I&N Dec. 486 (BIA 1996). An applicant for asylum bears the burden of proof, and we find that the respondent has not presented a believable, consistent, and sufficiently detailed claim so as to provide a plausible and coherent account of the basis for his alleged fear. *See Matter of E-P-,* 21 I&N Dec. 860 (BIA 1997); *Matter of Dass*, 20 I&N Dec. 120 (BIA 1989).

The Immigration Judge determined that the respondent's testimony was, for the most part, internally consistent, and he did not find the respondent's testimony incredible. However, we agree with the Immigration Judge that, as a whole, the respondent's testimony was lacking in specific detail. The testimony was vague regarding key elements of his asylum claim. For example, the respondent testified generally as to his arrest and the arrest of his father and uncle, but did not provide details of the event. He briefly stated that the

military came to his village with black Maurs, confiscated the villagers' animals, and arrested him. The respondent did not elaborate on the death of his cousin, merely stating, "[T]hey killed my cousin and they tied me up and they told the black Maurs to take the animals." He did not describe his detention other than its duration, did not explain the circumstances of his release, and did not illustrate the manner of his crossing into Senegal. The respondent's testimony was similarly sketchy concerning his stay at a refugee camp in Senegal. He did not offer critical details in his testimony to furnish context to his claim for asylum.

Further, the respondent's Request for Asylum in the United States (Form I-589) does not provide additional information regarding his claim. Rather, there are significant omissions in the written application. Notably absent from the respondent's application is any reference to his arrest and detention by the military. In his application, the respondent reflects, "Before deporting my family to Senegal I have been badly mistreated by Mauritanian army my brother too." The respondent makes no reference to the nature of the mistreatment. In answer to question 22 of the application, asking whether the applicant or any member of his family has ever been arrested, detained, interrogated, convicted and sentenced, or imprisoned in his native country, the respondent replied, "My father didn't want them to take our cattle so they arrested him." The application is devoid of any reference to his own detention, which he testified lasted 24 days.

In addition to his testimony, the respondent provided a photocopy of his Mauritanian national identity card, the original of his mother's Mauritanian national identity card, and articles concerning conditions in Mauritania. The respondent testified that he received the original of his identity card in Mauritania in 1987, and that the card was stolen after he arrived in the United States. According to the respondent, he brought his mother's identity card to the United States in case his card was lost.

The record of proceeding also contains a document from the United States office of the United Nations High Commissioner for Refugees ("UNHCR") indicating that the respondent is "not known" to the UNHCR office in Senegal. The Immigration Judge gave little weight to the UNHCR document because in the next sentence, the UNHCR office reported that another named person's "recepisse is forged," referring to neither the respondent nor his mother, but to an unknown individual. The UNHCR document is apparently in response to a query by the respondent's attorney for verification of the respondent's refugee status in Senegal. The record does not contain a copy of the respondent's request for such verification, and we are thus unable to discern the full context of the UNHCR response. We note that the respondent's name and date of birth are correctly reflected in the UNHCR response. Yet, as a whole, we are not confident of the document's reliability due to the reference to the unknown individual.

However, we note that the Immigration Judge twice continued the respondent's case to allow him to obtain confirmation of his stay in a refugee camp in Senegal. The respondent's case was again twice continued for 2 months, allowing him even more time to produce information. Therefore, the respondent had several opportunities to present information in support of his claim, with little results. Aside from the UNHCR document, the respondent did not submit any evidence of his alleged stay in a Senegalese refugee camp for 2 years and 4 months.

As noted above, the Immigration Judge did not make an express adverse credibility finding. However, the weaker an alien's testimony, the greater the need for corroborative evidence. *See Matter of E-P-, supra* (determining that a finding of credible testimony by an asylum applicant is not dispositive as to whether asylum should be granted; rather, the specific content of the testimony and any other relevant evidence should be considered). In this case, the general and vague nature of the respondent's testimony was not remedied by a showing of specific and detailed corroborative evidence of the respondent's claim.

We emphasize the distinction between the "benefit of the doubt" and the "burden of proof." When considering a quantum of proof, generalized information is insufficient. Specific, detailed, and credible testimony or a combination of detailed testimony and corroborative background evidence is necessary to prove a case for asylum. We recognize that a case may arise in which there is some *ambiguity* regarding an aspect of an alien's claim, at which time we might consider giving the alien the "benefit of the doubt" concerning the fact in issue. However, the instant case does not involve a question of ambiguity, but rather is simply a situation in which the alien failed to meet his burden of proof and present a believable, consistent, and sufficiently detailed claim so as to provide a plausible and coherent account of the basis for his alleged fear. *See Matter of E-P-, supra; Matter of Dass, supra*.

Inasmuch as the respondent has failed to satisfy the lower burden of proof required for asylum, it follows that he has also failed to satisfy the clear probability standard of eligibility for withholding of deportation. *See INS v. Stevic*, 467 U.S. 407 (1984). We therefore conclude that the respondent is statutorily ineligible for withholding of deportation.

**ORDER:**     The appeal is dismissed.

**FURTHER ORDER:**     Pursuant to the Immigration Judge's order and in accordance with our decision in *Matter of Chouliaris*, 16 I&N Dec. 168 (BIA 1977), the respondent is permitted to depart from the United States voluntarily within 30 days from the date of this order or any extension beyond that time as may be granted by the district director; and in the event of failure so to depart, the respondent shall be deported as provided in the Immigration Judge's order.

*CONCURRING OPINION:* David B. Holmes, Board Member, in which Lauri S. Filppu, Board Member, joined

I respectfully concur.

At the May 10, 1996, hearing in this case, the respondent, who was represented by counsel, testified regarding his applications for asylum and withholding of deportation. It is evident that at the conclusion of that hearing, the Immigration Judge who presided over the case was not fully satisfied that the respondent's testimony was such that it, in conjunction with the other evidence then of record, was sufficient to meet the respondent's burden of proof regarding his applications for asylum and withholding. *See* 62 Fed. Reg. 10,312, 10,342-43 (1997) (to be codified at 8 C.F.R. §§ 208.13(a), 208.16(b)) (interim, effective Apr. 1, 1997). The Immigration Judge's reservations in this regard clearly arose from uncertainty whether the facts, as related by the respondent regarding his own past history, were true. However, as the respondent had testified that he had stayed at the Mboumba refugee camp in Senegal for over 2 years after his flight from Mauritania, and as he had testified that he had been in telephonic communication with his mother, who he said was still in that camp, the Immigration Judge continued the hearing for 1 month to give the respondent the opportunity to obtain some verification of his stay at that refugee camp. The respondent did not raise any objection to the judge's action in this regard, argue that it was an unreasonable requirement, or urge that it would not be possible to obtain any such verification.

When the hearing reconvened on June 11, 1996, respondent's counsel noted that his office had not been able as of that time to obtain the requested verification of the respondent's stay at the Mboumba refugee camp. Counsel noted that he had made several attempts to do so, and that it was possible the information "could come any day." He requested an additional 30-day continuance, which the Immigration Judge granted over the Immigration and Naturalization Service's objection. Before closing the hearing on that date, the Immigration Judge directed the respondent's counsel to supply the Service and the Immigration Judge with any information that he had provided to the United Nations High Commissioner for Refugees ("UNHCR").

When the hearing reconvened over 3 months later, on September 18, 1996, the respondent, through counsel, presented a letter dated July 18, 1996, from a UNHCR legal officer addressed to respondent's counsel. The letter was in response to counsel's letter to the UNHCR requesting verification of the respondent's refugee status in Senegal. The legal officer's letter noted that "UNHCR, Senegal informed us that [the respondent] is not known to their office." The letter also informed counsel that the "recepisse [of a person with the same last name as the respondent's] is forged." The UNHCR letter advised the respondent's counsel that if he had any further questions not to hesitate to contact their office. Although respondent's counsel presented this letter to the Immigration Judge, he did not include his own letter to the

UNHCR to which this letter was a response, nor did he indicate that he had further communicated with the UNHCR legal officer. The respondent, through counsel, did not request any further continuance and, without further explanation, indicated that he did not plan on submitting any additional documentary evidence. The Immigration Judge marked the UNHCR letter for identification, but did not place it into evidence because of the unexplained reference to the other name.[1]

The respondent bears the burden of proof with regard to his applications for asylum and withholding of deportation. I do not know whether this respondent's testimony was truthful. There are certainly some aspects of his testimony that do not ring true to me (e.g., his testimony that his mother remained in a refugee camp in Senegal, but that he had her identification papers because "she was old and she was not using the papers anymore"). However, I do find that it was reasonable under the facts of this case for the Immigration Judge to ask for additional evidence that could confirm a meaningful factual aspect of the respondent's claim.[2] And, the Immigration Judge granted the respondent a generous period of time to obtain that evidence. If the respondent had been able to verify his claim that he had been at the Mboumba refugee camp, the Immigration Judge may have found that evidence, together with the respondent's testimony and the other evidence of record, sufficient to meet the respondent's burden of proof. The factual evidence requested by the Immigration Judge appeared to be something that was reasonably available. The respondent did not argue before the Immigration Judge or on appeal that the Immigration Judge's request in this regard was

---

[1] In my view, the Immigration Judge erred in not accepting this document into evidence. It was presented by respondent's counsel. It was relevant and its authenticity was not in question. There was no objection to the document from the Service. The letter was in response to respondent's counsel's inquiry, which was not offered into evidence by the respondent and which may have explained the reference to the other name. Moreover, respondent's counsel had months before the final hearing in which to seek clarification from the UNHCR legal officer, or a statement regarding the significance (or lack of significance) of the fact that the respondent was not known to the UNHCR, Senegal. While the reference to the other name may have affected the weight to be given the UNHCR letter by the Immigration Judge, under the facts here, it should not have resulted in the refusal to accept the document into evidence.

[2] The dissent states that to conclude an asylum applicant has not met his or her burden, "an adjudicator must either reject the testimony as lacking in credibility, or find that the testimony, even if credible, does not adequately give rise to an inference that the applicant is a 'refugee' as defined in the Act." *Matter of Y-B-*, 21 I&N Dec. 1136, 1150 (BIA 1998) (Rosenberg, dissenting). Thus, in the dissent's view, the adjudicator must either make an affirmative finding that an applicant's testimony is incredible or must accept the applicant's testimony as true and solely decide whether the applicant's testimony is sufficiently detailed and consistent to give rise to "an inference" that the applicant is a refugee. If it is, then an adjudicator apparently would err in requiring from the applicant evidence "more than the testimony provided." *Id*. I do not agree that this is a correct statement of law. *See, e.g., Matter of S-M-J-*, 21 I&N Dec. 722, 723-26 (BIA 1997); *see also* Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951*

either unreasonable or one that could not be fulfilled. And, more importantly, neither before the Immigration Judge nor on appeal does the respondent offer any explanation for the unavailability of verification from the UNHCR or otherwise, of his claimed stay of over 2 years at the refugee camp in Senegal. The respondent argues on appeal that the absence of such verification is not necessarily fatal to his application. However, it is not simply the absence of this verification that is significant to me, but its absence without further explanation (i.e., as to why the failure to produce the verification should not be deemed significant). There may be an explanation, but it was not presented before the Immigration Judge or proffered on appeal.[3]

The Immigration Judge's request for verification of the respondent's presence at the refugee camp in Senegal has not been shown to be unreasonable. The letter from the UNHCR to respondent's counsel reflects that the respondent was "not known" to the UNHCR, Senegal. Further evidence in this regard was not presented. To date, the respondent has offered neither an explanation for the absence of evidence verifying his (or his mother's) stay at a refugee camp in Senegal nor any specific reason why this lack of verification should not be deemed significant. Given this evidentiary gap, which remains unexplained, I do not find that the Immigration Judge erred in finding that the respondent failed to meet his burden of proof on this record.

Both the majority and the dissent make reference to the concept of giving an asylum applicant the "benefit of the doubt." I am not certain that either's discussion in this regard adds much clarity to how one evaluates an application for asylum and the evidence presented in support thereof. Under existing law, the respondent bears the burden of proof. And, to the extent this concept

---

*Convention and the 1967 Protocol Relating to the Status of Refugees* para. 205, at 48-49 (Geneva, 1992).

There are cases in which an Immigration Judge can make an affirmative finding that an asylum applicant's testimony either is or is not truthful. There are also instances in which an Immigration Judge is left with uncertainty in this regard (e.g., situations where the Immigration Judge is not entirely convinced of the applicant's candor, but also is not fully satisfied that the applicant has testified falsely). In this latter situation, it is important that the applicant have supported his or her testimony with any other available evidence or have given a satisfactory explanation for the lack of such evidence. Absent a contrary, controlling circuit court precedent, the absence of an explicit adverse credibility finding does not mean that an Immigration Judge must accept the applicant's testimony as true and must determine whether the applicant has met his or her burden solely by evaluating the detail and consistency of the testimony presented.

[3] The dissent characterizes the concern in this regard as arising from the respondent's inability to provide a "better explanation" for the absence of any evidence verifying his claimed 2-year presence at the refugee camp, but this respondent has offered *no* explanation whatsoever for the lack of such evidence. Indeed, there are occasions when either the reasonableness or the implausibility of a proffered explanation aids materially in finding the alien credible or not credible. The dissent's approach tends to encourage asylum applicants to offer as little proof as possible in the hopes that the adjudicator can surmise a plausible reason for overcoming evidentiary deficiencies.

is either viewed or applied as supplanting the respondent's burden in this regard, I would not find it consistent with the law that controls our adjudication of this case. The burden of proof could be allocated in various ways, but under existing regulations, the burden rests with the applicant for relief. *See* 8 C.F.R. §§ 208.13(a), 208.16(b). However, in my view this concept of "benefit of the doubt" permeates a number of the Board's decisions that address an asylum applicant's evidentiary burden. For example, the Board has held that it would not be reasonable to require an applicant for asylum to prove with absolute certainty the exact motivation of a persecutor where different reasons for a persecutor's actions are possible. See Matter of Fuentes, 19 I&N Dec. 658 (BIA 1988); *see also Matter of S-P-*, 21 I&N Dec. 486 (BIA 1996). Similarly, in discussing the need for supporting evidence, both of general country conditions and of the specific facts sought to be relied upon by an applicant, the Board has recognized that such evidence may be unavailable to an applicant for asylum for a variety of understandable reasons. *See Matter of S-M-J-,* 21 I&N Dec. 722 (BIA 1997); *Matter of Dass*, 20 I&N Dec. 120 (BIA 1989). The Board has simply ruled that where such evidence is unavailable, the applicant should explain why such is the case.

In the present case, what is important to me is the reasonableness of the Immigration Judge's directive and the absence of any explanation for the respondent's apparently complete inability to verify his 2-year stay (or his mother's continuing stay) at the refugee camp in Senegal. Had the respondent provided an explanation for the absence of such evidence, I might have given him the "benefit of the doubt" regarding the lack of evidence corroborating that factual claim. However, in my view, the "benefit of the doubt" should not extend to mere speculation as to why significant evidence has not been presented when an applicant for asylum, particularly an applicant represented by counsel, offers no explanation for its absence.

Considering the existing record and the arguments presented on appeal, I do not find the Immigration Judge erred in concluding that this respondent failed to adequately meet his burden of proof.

Accordingly, I concur in the dismissal of his appeal.

*DISSENTING OPINION:* Lory D. Rosenberg, Board Member, in which Paul W. Schmidt, Chairman, and John W. Guendelsberger, Board Member, joined

I respectfully dissent.

The resolution of this appeal requires us to determine whether, in the absence of additional detail or specific corroborating documentation, the respondent, who provided consistent testimony and documentary evidence, has established persecution or a well-founded fear of persecution on account of a ground enumerated in the Immigration and Nationality Act.

Neither the Immigration Judge nor the majority found the respondent to lack credibility. The question, therefore, is not whether his story is true, but

whether it was sufficiently specific and detailed to establish a well-founded fear of persecution and support a grant of asylum. According to the majority, the answer is no. I do not agree.

## I. ESSENTIAL ELEMENTS OF RESPONDENT'S PERSECUTION CLAIM

We have held that to establish a well-founded fear of persecution, an applicant for asylum must demonstrate that he was subjected to or fears being subjected to harm, on account of race, religion, nationality, membership in a particular social group, or political opinion, by the government or a group outside the government's control that could become aware of the victim and that has both the inclination and the ability to persecute him. *Matter of Kasinga,* 21 I&N Dec. 357 (BIA 1996); *see also INS v. Cardoza-Fonseca,* 480 U.S. 421 (1987); *Matter of Mogharrabi*, 19 I&N Dec. 437 (BIA 1987) (reiterating, with one modification, the four elements set forth in *Matter of Acosta,* 19 I&N Dec. 211 (BIA 1985)).

The respondent testified to his race and nationality, as well as to his membership in his tribe, a particular social group, and to both the harm he experienced at the hands of the government because of these characteristics and his fear he will be killed if forced to return to Mauritania. *Matter of H-*, 21 I&N Dec. 337 (BIA 1996). This uncontroverted evidence establishes, or supports an inference establishing, each of the four prongs that we have held to be the essential elements required to demonstrate a well-founded fear of persecution as defined in the statute. *See Matter of Mogharrabi, supra,* at 446.

### A. Consistent Testimony Found and No Adverse Credibility Determination Made

The respondent testified to the following:

(1) that he is a black African-Mauritanian of the Halpulaar tribe, and that he was accosted, robbed of his animals, arrested, bound, and beaten by Mauritanian Government soldiers;

(2) that this occurred on account of his race and tribal background, and that such incidents are internationally documented and acknowledged to have occurred for this reason;

(3) that during a confrontation with government soldiers, his cousin was killed and his father and uncle also were arrested, bound, beaten, and detained;

(4) that he was "arrested" and detained in a military camp without any charges, process, or judgment for nearly a month, and that he eventually was forced across the river into exile in Senegal by government soldiers, and that such treatment of black Maurs is internationally acknowledged as having been perpetrated by the white Maur government's military and not prevented by the Mauritanian Government; and

(5) that he remained for 2 years in a refugee camp in Senegal with his mother and paternal grandmother, who had been forced out of Mauritania the day of his "arrest," and that he fears he would be killed if he attempted to return to Mauritania.

The Immigration Judge expressly found the respondent's testimony to be internally consistent, and made no express finding that he lacked credibility. In the asylum context, credibility findings are made according to generally accepted criteria including consistency, specificity, and detail, which lend support to the believability and plausibility of the facts related. *Matter of Mogharrabi, supra,* at 446 (holding that an applicant's testimony alone can suffice to meet his burden of proof where such testimony is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis of the applicant's alleged fear); *see also Matter of S-M-J-*, 21 I&N Dec. 722 (BIA 1997). To be sustained, an adverse credibility determination must be supported by specific and cogent reasons, meaning those that are "'substantial and [must] bear a legitimate nexus to the finding.'" *Lopez-Reyes v. INS*, 79 F.3d 908, 911 (9th Cir. 1996) (quoting *Nasseri v. Moschorak,* 34 F.3d 723, 726 (9th Cir. 1994); *see also Aguilera-Cota v. INS,* 914 F.2d 1375, 1381 (9th Cir. 1990) (citing *Turcios v. INS,* 821 F.2d 1396, 1399 (9th Cir. 1987)).

Although the Immigration Judge and the majority did not make an affirmative credibility finding, they made no adverse finding, and indeed, there is no basis in this record on which to make an adverse finding. I find no reason to disbelieve the testimony presented and would find the respondent to be a credible witness. *Matter of B-*, 21 I&N Dec. 66 (BIA 1995).

## B. Specificity and Detail in Testimonial Evidence Presented

Judges and attorneys are, or should be, well aware that every well-told narration of events relies on the "who, what, where, when, and how." The demand for specificity and detail as a measure of credibility, therefore, should be a relatively straightforward and comprehensible requirement. In the asylum context, this requirement may be tempered by individual considerations such as the length and atmosphere of the hearing and the experiential, educational, and cultural factors particular to the individual respondent.

The record before us actually contains significant detail. In reaching the conclusion that the respondent's claim was lacking in such detail, the majority, like the Immigration Judge, does not appear to consider documentation in the record indicating that herders of the Halpulaar tribe, like the respondent, are completely unschooled, generally illiterate, and possibly even unable to count.

In particular, the majority contends that the respondent failed to provide specific details concerning his arrest and that of his father and uncle. However, in testimony before the Immigration Judge, the respondent related that he, his cousin, and some friends were tending their herds just outside the town where they lived, when they were accosted by approximately 60 "white" Maur government soldiers. The soldiers approached the respondent and beat him, tied him up, killed his cousin, and took the animals. Thus, the

respondent provided information concerning whom he was with, where he was, and how many government soldiers accosted him.

The respondent testified further that he was thrown in a truck by the soldiers and taken into town, where his father and uncle were dragged out of their house, were similarly bound, were beaten like the respondent with belts, and were forced to watch as their house was ransacked. Thus, the respondent indicated how he was treated when first confronted by his persecutors, how he got into town, where the soldiers took him, what happened to his father and uncle, and the implement with which all of them were beaten.

The majority, echoing the Immigration Judge, states that the respondent's failure to provide "detail" about his arrest and his cousin's death compromises his claim. The respondent's testimony that his cousin was killed *is detail* related to his own arrest. A large group of white Maur soldiers approached, ordered the animals seized, grabbed and beat the respondent, tied him up and even killed one of the people with him—his cousin. It is difficult to understand what further information would satisfy the majority: that his cousin bled to death, that he was struck unconscious, that he cried, flinched, or had a seizure, that the ground where he fell was muddy, sandy, or hard clay? Do they expect the respondent to describe his emotions at witnessing his cousin being killed and his animals being seized?

Clearly, a medical diagnosis or autopsy report is not likely to be forthcoming under such circumstances. Similarly, the recounting of a violent event by one without an education or unaccustomed to lengthy written or spoken discourse as a means of communication is hardly likely to find expression in an elaborated verbal narrative. Even those with a formal education or from a tradition in which such detail may be valued and nurtured may consciously or unconsciously suppress such expression as a consequence of the traumatic experience itself.

In fact, the respondent related that his cousin was killed in the attack by the white Maurs, and later explained—when asked in cross-examination whether he had informed the asylum officer from the Immigration and Naturalization Service that the military had killed his brother—that the person killed actually was his cousin, whom the respondent regarded as a younger brother. Furthermore, although his written application did not specifically mention an "arrest," he reported that he had been badly mistreated by the Mauritanian Army, and testified before the Immigration Judge, "I told the person who was filling it out to write [the arrest] down." The respondent explained that a Halpulaar acquaintance who speaks English filled out the asylum application, but that this person did not read the application back to him.

In addition, the respondent provided significant detail about his capture or "arrest" and detention. He explained that while he was bound, he learned, through what he could understand of his captors' language, that his father had been taken to Elega, whereas he and his uncle were taken to Mbagme. The

respondent related that he was detained for 24 days. According to his account, he was arrested on September 9, 1989, and was released and forced across the border into Senegal on September 30, 1989, because many of the prisoners were dying and their captors did not want them to die in Mauritania. He thus provided specific information about the different language used by the white Maurs, and gave quite specific detail concerning the actual date of his arrest and the number of days that he was detained.

On the whole, the respondent provided a specific and detailed description of the events that occurred when he was confronted by the Mauritanian military. Although he did not testify at length regarding his detention, the testimony he provided was concise and clear. When asked to elaborate, he clarified what had occurred and adequately explained the apparent discrepancies between his written application and his testimony before the Immigration Judge.

The majority's decision turns on its assessment that the respondent failed to meet his burden of proof. According to the majority, his claim was not "sufficiently detailed" to be "plausible and coherent." *Matter of Y-B-*, 21 I&N Dec. 1136, 1137 (BIA 1998). In such life and death matters as often are present in asylum claims where we are supposed to have expertise, the Board must strive for clarity and exactitude, not only with regard to the law that governs our adjudications, but in our reasoning. *See Osorio v. INS*, 18 F.3d 1017 (2d Cir. 1994); *see also Marquez v. INS*, 105 F.3d 374 (7th Cir. 1997); *Rodriguez-Roman v. INS*, 98 F.3d 416 (9th Cir. 1996). The majority does not indicate, however, what additional detail or elucidation would convert the respondent's allegedly inadequate claim into a meritorious one.

## C. Documentary Evidence Presented Establishing a Plausible Account of Persecution

The facts asserted by the respondent in support of his asylum application were presented consistently in his written Request for Asylum in the United States (Form I-589) and in his testimony before the Immigration Judge. These facts establish a plausible account of persecution in light of uncontroverted background evidence that the ruling "white" Maurs of Mauritania who control the government systematically forced black-African Mauritanians, particularly of the Halpulaar tribe, into detention and exile on account of their race.

The respondent produced a copy of his own Mauritanian identity card.[1] The Immigration Judge noted that the respondent's testimony reflected that he was a herder and that he had procured his identity document in Mbagme. Although the respondent's national identity document indicated that the

---

[1] He also provided his mother's identity card. According to his testimony, the respondent brought his mother's identification document with him because she remained in the camp and had no use for the card, and because he wanted to have as much documentation as possible.

document was obtained or issued by the police in Nouakchott, the capital city, this is not necessarily contradictory. I note that various documents in the United States, including passports, may be issued by authorities located in a city other than that of the bearer's residence.

Furthermore, although unexplained, the fact that the respondent's identity document indicates he is a trader, whereas in testimony he related that he is a farmer and herder, does not constitute a discrepancy that relates to the crux of respondent's asylum claim. *See Matter of Kasinga, supra* (finding that inconsistencies which do not undermine the heart of an asylum claim should not be the basis for dismissing such a claim). There is no reason to disbelieve that the respondent is in fact a herder from the Halpulaar tribe, as the entirety of his testimony and the documentary evidence presented concerning the Halpulaar tribe supports this conclusion. Similarly, the respondent's lack of knowledge concerning the population of his hometown has little bearing on his asylum claim. He described it simply as a "big town" and noted that a number of people live there. The respondent was asked only about the size of the city, and was not questioned regarding other details.

The substance of the respondent's claim is corroborated by country condition evidence contained in the record. The most recent State Department report on conditions in Mauritania supports the respondent's claim that African-Mauritanians were expelled from Mauritania to Senegal from 1989-1990. Committees on Foreign Relations and International Relations, 105th Cong., 1st Sess., *Country Reports on Human Rights Practices for 1996* 173 (Joint Comm. Print 1997) [hereinafter *Country Reports*]. According to the report, there were massive human rights abuses committed against African-Mauritanians during the period of 1989 to 1991, when thousands of Mauritanians were expelled or fled, and hundreds were arrested, tortured, and killed. The report notes that successive government regimes have vigorously pursued a policy of "Arabization" of the schools and the work force, which has the effect of serious discrimination against non-Hassaniya-speaking African-Mauritanians. In addition, the record contains numerous articles submitted by the respondent which support his account of serious human rights violations—including torture, summary execution, mass expulsion, and slavery—that have been perpetrated by Mauritanian authorities against black African-Mauritanians.

## II. RESPONDENT'S BURDEN OF PROOF

In asylum cases, the burden of proof rests on the applicant to prove his claim. *Matter of S-M-J-, supra*, at 723; 62 Fed. Reg. 10,312, 10,342 (1997) (to be codified at 8 C.F.R. § 208.13(a) (interim, effective Apr. 1, 1997); Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951*

*Convention and the 1967 Protocol Relating to the Status of Refugees* para. 196, at 47 (Geneva, 1992) ("*Handbook*");[2] *see also Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir. 1997); *Osorio v. INS, supra*, at 1021-22. The "burden of proof" is an evidentiary allocation of the proof necessary to establish something, often the dispositive factor, in a case or controversy.[3] It means that the applicant is responsible for providing evidence to satisfy the applicable "standard of proof" assigned to his or her claim.

The standard of proof applicable to an asylum claim is a "well-founded fear of persecution" under section 208(a) of the Immigration and Nationality Act, 8 U.S.C. § 1153(a) (1994). Thus, the applicant's burden is to provide evidence necessary to persuade the adjudicator he has a well-founded fear of persecution, which is composed of two elements: a subjective element—fear—and an objective element—that the fear is "well-founded." *See, e.g., INS v. Cardoza-Fonseca, supra.*

Credible testimony establishing the subjective fear and objective factors that constitute the essential elements of a claim—that the fear is of a level of harm that amounts to persecution, that the harm is on account of a protected characteristic, that the persecutor could become aware or already is aware of the characteristic, and that the persecutor has the means and inclination to persecute—supports an inference that a reasonable person in the respondent's circumstances would fear persecution and, therefore, satisfies the standard. *See Matter of Mogharrabi, supra*, at 446; *Matter of Acosta, supra,* at 226.

We have held that an applicant's testimony that is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis of the applicant's alleged fear suffices to fulfill the burden of proof. *Matter of S-M-J-, supra*, at 724 (citing *Matter of Mogharrabi, supra* at 446); *see also Turcios v. INS, supra*, at 1402 (recognizing that an authentic refugee

---

[2] The *Handbook* provides practical guidance to government officials as they are determining refugee status under the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, which was enacted to bring United States refugee law into conformance with our international obligation of nonrefoulement under the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 137 ("Convention"), and the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268 ("Protocol"). *INS v. Cardoza-Fonseca, supra*, at 436-37 (1987); *Matter of Q-T-M-T-,* 21 I&N Dec. 639 (BIA 1996) (Rosenberg, dissenting); *Matter of Rodriguez-Palma*, 17 I&N Dec. 465, 468 (BIA 1980).

[3] The term "burden of proof" typically is used to encompass both the burden of production, that is, who is expected to establish the requisite facts, and the burden of persuasion, that is, the degree to which a fact finder must be persuaded based on the evidence presented. McCormick, *McCormick on Evidence* § 341 (Edward M. Cleary ed., 3d ed. 1984); *see also* Karen Musalo, *Irreconcilable Differences? Divorcing Refugee Protections From Human Rights Norms,* 15 Mich. J. Int'l L. 1179, 1200 (1994) (citing Fleming James, Jr. and Geoffrey C. Hazzard, Jr., *Civil Procedure* § 7.5 (3d ed. 1985)); Robert Belton, *Burdens of Pleading and Proof in Discrimination Cases: Toward a Theory of Procedural Justice*, 34 Vand. L. Rev. 1205, 1206 n.3 (1981).

often is limited in his ability to offer direct corroboration of specific incidents of persecution, and that "[t]herefore, an alien's unrefuted and credible testimony may be sufficient"). In other words, an articulation of fear, coupled with testimony concerning events or circumstances that are plausible in light of known, documented conditions, constitute both the subjective and objective elements of a persecution claim and can satisfy the applicant's burden. *See Carvajal-Munoz v. INS*, 743 F.2d 562, 574 (7th Cir. 1984) (holding that because specific, objective facts that support an inference of past persecution or risk of future persecution are established through credible and persuasive testimony does not make those facts less objective); *see also Bolanos-Hernandez v. INS*, 767 F.2d 1277, 1285 (9th Cir. 1985); *McMullen v. INS*, 658 F.2d 1312, 1319 (9th Cir. 1981).

Despite the evidence of record described above, the majority has adopted the decision of the Immigration Judge that, although his testimony did not lack credibility, the respondent simply failed to satisfy his burden of proof. Furthermore, the majority declares that he does not deserve to be accorded the "benefit of the doubt" with respect to certain uncorroborated elements of his claim. In recognition of our holding in *Matter of S-M-J-, supra*, that each of the participants in an asylum hearing bears some responsibility for adducing the facts and developing the claim, I find it appropriate to address each of these conclusions in turn.

## A. Role of the Asylum Applicant

### 1. Presentation of Adequate Testimony

The majority's conclusion that the respondent failed to satisfy his burden of proof—like that of the Immigration Judge in proceedings below—rests upon an erroneous formulation of the evidentiary standard in asylum cases. We have stated and reaffirmed that testimony alone, if unrefuted and credible, is perfectly adequate to satisfy an asylum applicant's burden of proof of a threat in the country to which he is subject to return. *See Matter of S-M-J-, supra*, at 725; *Matter of H-, supra*; 8 C.F.R. § 208.13(a). I regard the decisions of both the Immigration Judge and the majority as divergent from this established precedent.

To conclude that the burden has not been satisfied, an adjudicator must either reject the testimony as lacking in credibility, or find that the testimony, even if credible, does not adequately give rise to an inference that the applicant is a "refugee" as defined in the Act. If the adjudicator requires more than the testimony provided, then, in essence, the adjudicator is asserting that the witness cannot be believed on his her testimony alone, or that the testimony does not support the necessary inference. *See Carvajal-Munoz v. INS, supra*, at 574 (holding that an asylum applicant need only "present *specific* facts establishing that he or she actually has been the victim of persecution" on account of a protected ground; specific facts are sufficient if they "give rise to

an inference that the applicant has been . . . [the victim of] persecution on one of the specified grounds"). In either of such cases, the adjudicator should provide his or her reasoning in support of such a conclusion.

For example, if the respondent's testimony is consistent internally, he has not been found to lack credibility, he has testified to having been harmed by government military forces because he is black, and he has related that such harm was inflicted, at least in part, to seize his property and exile him because of his race, then he would appear to have met his burden. Greater detail would merely enhance the conclusion that he has satisfied the burden. *Id*. The only exception would be if the adjudicator determined that he could not be believed.

The majority could have determined that the respondent did not provide sufficient detail to be believed, and dismissed his claim as not credible. However, they declined to do so. If the majority believes that the respondent's credibility or identity are at issue, or is not convinced that events occurred as the respondent testified, a clearly articulated adverse credibility determination is required. Such determination must contain specific and cogent reasons. *See Matter of S-M-J-, supra*, at 728-29. None were advanced here.

Similarly, if the majority finds the testimonial evidence insufficient to support an inference, they should identify the inadequacies, including what missing elements would be adequate to support an inference. The factual inadequacies they did identify, such as a lack of detail concerning the respondent's apprehension and detention, are simply incorrect and contradicted by the record. *See Matter of Y-B-, supra*, at 1137. Absent an articulation of actual gaps or inconsistencies in the record, I am left to wonder how additional details would help satisfy the burden of proof.

Furthermore, a claim of past persecution does not warrant the imposition of a higher standard of proof. *See INS v. Cardoza- Fonseca, supra*, at 449-50; *Marquez v. INS, supra*. To the contrary, past persecution may be more capable of supporting an inference in the absence of corroborating documentation, because it addresses an event that already has occurred, and does not involve predictions concerning the likelihood that an event might occur. *Draganova v. INS*, 82 F.3d 716, 721 (7th Cir. 1996) (holding that the evidence presented need not conclusively prove that the applicant suffered past persecution and stating, "We see no reason to set a greater burden of proof— such as conclusive proof—for a claim of past persecution than for a claim that persecution would occur in the future."). As long as the testimony is specific enough to support an inference that harm was inflicted by government officials on account of the respondent's race, the burden has been met.

## 2. Corroborating Documentation

The majority does not appear to expect the respondent is in a position to provide documentation of his occupation, apprehension, or detention. I agree that such an expectation would not be reasonable. *See Matter of S-M-J-,*

*supra; Handbook, supra*, para. 197, at 47 (stating that the requirement of evidence should not be too strictly applied in view of the difficulty of proof inherent in the special situation in which an applicant for refugee status finds himself).

Moreover, we have held that "specific documentary corroboration of an applicant's particular experiences is not required unless the supporting documentation is of the type that would normally be created or available in the particular country and is accessible to the alien, such as through friends, relatives, or co-workers." *Matter of S-M-J-, supra*, at 726. We consider it appropriate for an adjudicator to request such documentation, and to provide the applicant a reasonable period of time within which to obtain it. In this case, the Immigration Judge made such a request, and the respondent took steps to comply with the request, eventually providing the documentation that he was able to obtain.

The process of obtaining a document from a refugee camp, however, even assuming that such evidence goes to the heart of the respondent's claim because it corroborates who he professes to be, has not been shown to be foolproof, and there is no basis to conclude that the document is even readily available. The Department of State has reported that of the approximately 70,000 Afro-Mauritanians who were expelled or fled to Senegal in 1989-1991, an estimated 55,000 refugees remain in camps in Senegal, and the UNHCR has only recently begun to assist in the issuance of identity documents to refugees contemplating returning to Mauritania. *Country Reports, supra*, at 177. Given the circumstances that inhere in a refugee camp in Senegal, the evidence submitted reveals that a good faith effort was made to obtain such a document.[4]

Thus, the fact that a refugee document pertaining to the respondent was not received by respondent's counsel, and could not be presented to the Immigration Judge, indicates only that the person responding to the request was unable to locate the document. The respondent provided the Immigration Judge with the documentation that he did receive in response to his request.

---

[4] It is not improper to take notice administratively that refugee camps in developing third world countries often lack the staff or advanced computer resources that would provide the accuracy necessary to treat the absence of any record as more than a mere anecdotal factor. As the UNHCR has explained,

> [I]n countries where assistance is provided, separate registration systems usually exist, with varying degrees of quality, for refugees in camps, in urban areas, those living among local populations, those who are not assisted, etc. . . . To address these deficiencies, UNHCR has continued to review and improve its own registration practices. With time, improved registration systems will make statistics on populations of concern to UNHCR . . . more reliable.

*Refugees and Others of Concern to UNHCR: 1996 Statistical Overview* (Office of the United Nations High Commissioner for Refugees, Washington, D.C.), 1996, at 3-4.

Moreover, that the respondent was unable to obtain a document verifying his stay in the refugee camp does not indicate that such a document does not exist, that the respondent was not there, or that he is not who he claims to be. Even the most diligent agency operating under much more optimal conditions (such as ours) occasionally loses a file or improperly keys in data concerning the identity of an appellant. Barring evidence that such a document is readily available, the absence of a certificate concerning the respondent's presence in a refugee camp should not detract from the fact that he has met his burden on the basis of consistent and plausible testimony concerning the persecution that he experienced. *See Aguilera-Cota v. INS, supra*, at 1380; *Bolanos-Hernandez v. INS, supra*, at 1285; 62 Fed. Reg. 10,312, 10,342-43 (1997) (to be codified at 8 C.F.R. §§ 208.13(a), 208.16(b) (interim, effective Apr. 1, 1997).

Notably, the Immigration Judge himself gave little weight to the document that was provided and did not appear to rely on it one way or the other. By contrast, the majority and the concurring Board Members appear to rely on it as warranting a negative inference that undermines the respondent's claim. However, in light of a record that establishes by a totality of the evidence that the respondent suffered harm on account of a protected ground at the hands of a government persecutor, I can find no defensible rationale for the conclusion that the respondent failed to satisfy his burden of proving eligibility for asylum because of his inability to obtain that document, or better to explain its absence.

## B. Role of the Immigration Judge

In *Matter of S-M-J-, supra*, we cited with approval the guidelines for asylum adjudicators set forth in the *Handbook*, observing that "'while the burden of proof in principle rests on the applicant, the *duty to ascertain* and evaluate all the relevant facts is shared between the applicant and the examiner.'" *Matter of S-M-J-, supra*, at 729 (quoting *Handbook, supra*, para. 196, at 47) (emphasis added). Moreover, we advised that it is the Immigration Judge's role to "'[e]nsure that the applicant presents his case as fully as possible and with all available evidence.'" *Id*. (quoting *Handbook, supra*, para. 205(b)(i), at 49).

The Immigration Judge correctly observes that it is the respondent who bears the burden of proving his asylum claim. *Matter of S-M-J-, supra*, at 724. However, we have emphasized the critical nature of the Immigration Judge's function in adducing evidentiary materials and acting affirmatively to remedy an otherwise "inadequate" record. *Id*. at 8-11. The *Handbook* provides further that it is up to the asylum adjudicator (in this instance, the Immigration Judge) to attempt to "resolve any contradictions . . . and to find an explanation for any misrepresentation or concealment of material facts." *Handbook, supra*, para. 199, at 47.

In his decision, the Immigration Judge stated that the respondent's testimony was "generalized, vague, lacking specifics and details" regarding his occupation, the arrest of himself, his father, and his uncle, the death of his cousin, and his stay at and departure from a refugee camp in Senegal. With respect to each area of "vagueness and inspecificity," however, the transcript reveals that the Immigration Judge did nothing to elicit further details, or to explain what additional specific information or particular detail he felt was required. *See also* section 242(b) of the Act, 8 U.S.C. § 1252(b) (1994)(providing that the Immigration Judge "*shall* administer oaths, present and receive evidence, *interrogate, examine, and cross-examine* the alien or witnesses") (emphasis added).

Notwithstanding this lack of inquiry, the Immigration Judge and the majority relied on the alleged lack of detail provided to deny the claim. Before the perceived absence of specificity becomes the fatal flaw in an asylum claim, the Immigration Judge should ask for more detail, should seek reasonable explanations for perceived inconsistencies or omissions, and in general, should make clear what it is he or she wants or needs to know about the claim. This simply was not done.

The Immigration and Naturalization Service, the Immigration Judges, and this Board "all bear the responsibility of ensuring that refugee protection is provided where such protection is warranted by the circumstances of an asylum applicant's claim." *Matter of S-M-J-, supra*, at 723. If the Immigration Judge fails to ask for more detail, seek reasonable explanations of apparent contradictions or even omissions, and make clear exactly what he or she wishes to know, then it is the rare asylum applicant who will be able to satisfy the "burden of proof," as interpreted by the majority. *See id*. at 727, 728, 10; *Handbook, supra*, paras. 199, 203, 205(b), at 47-49. Under such circumstances, the Board—rather than dismissing the respondent's appeal as not "sufficiently detailed"—would serve the interests of justice by remanding the case for further testimony in those areas identified as deficient by the Immigration Judge.

## III. BENEFIT OF THE DOUBT

In the course of dismissing the respondent's appeal, the majority finds it necessary to "emphasize the distinction" between the "burden of proof" and the "benefit of the doubt." *Matter of Y-B-, supra*, at 1139. Apparently, the majority "might consider" granting an alien the benefit of the doubt only when his or her case contains some ambiguity. *Id*. at 1139. The majority maintains that this is not such a case.

In my view, the primary ambiguity in this case resides in the majority's formulation and application of the burden of proof required in order to be granted asylum. Although the majority decries the "general and vague nature" of the respondent's testimony, they offer only the vaguest and most

general reasoning for their conclusion that the respondent did not adequately prove that he suffered past persecution or harbors a reasonable fear of future persecution in Mauritania.

The majority has neither offered any basis to reject the respondent's credible testimony, nor identified a failure of proof with respect to the evidence provided by the respondent concerning the harm he suffered, or the reasons or source of the harm. Moreover, the majority's formulation of the circumstances under which the Board ought to accord an asylum applicant the benefit of the doubt does not comply with Board precedent or with the guidance set forth in the *Handbook*.

In *Matter of S-M-J-, supra*, we explicitly recognized our obligation to offer refuge to persons who qualify for relief in the forms of asylum and withholding of deportation, and advised that in light of the adversarial nature of asylum proceedings before an Immigration Judge, "a cooperative approach in Immigration Court is particularly appropriate." *Id*. at 724. We acknowledged, accordingly, that despite an alien's best efforts to substantiate his claim, he may lack evidence to corroborate certain of his statements. Because he is obviously not required to "prove" every element of his case, "'[i]t is therefore frequently necessary to give the applicant the benefit of the doubt.'" *Id*. at 725 (quoting *Handbook, supra*, para. 203, at 48).

According to the *Handbook*, "The cumulative effect of the applicant's experience must be taken into account. . . . [A]lthough no single incident may be sufficient, all the incidents related by the applicant taken together, could make his fear 'well-founded.'" *Handbook, supra*, para. 201, at 48 (citation omitted). An accurate depiction of "the applicant's experience" may include such considerations as the applicant's illiteracy, unfamiliarity with communicating verbally or in great detail, and, owing to past experience, general fear of authorities such as asylum officers and Immigration Judges. *See, e.g., Castro-O'Ryan v. United States Dep't of Imm. & Naturalization,* 847 F.2d 1307 (9th Cir. 1988). Consequently, the *Handbook* advises that "if the applicant's account appears credible, he should, unless there are good reasons to the contrary, be given the benefit of the doubt." *Handbook, supra,* para. 196, at 47.

The *Handbook* makes clear that an asylum applicant should be given the benefit of the doubt "when all available evidence has been obtained and checked" and where the adjudicator "is satisfied as to the applicant's general credibility." *Handbook, supra*, para. 204, at 48. Furthermore, before the benefit of the doubt can be accorded, an asylum applicant's statements "must be coherent and plausible, and must not run counter to generally known facts." *Id*.

Apart from the unspecified concerns expressed by the Immigration Judge and the majority that the respondent's evidence lacked detail and specificity, the only missing element in the respondent's claim is a refugee document confirming his presence in the refugee camp. In this case, all the available

evidence "has been obtained and checked." The respondent's claim was found to be consistent, and his account of events is coherent and plausible in light of the documentation of country conditions contained in the record.

Under these circumstances, both the *Handbook* and our own precedent indicate that, in examining the facts applying the evidentiary burden of proof, the respondent is entitled to the benefit of the doubt. The "benefit of the doubt" as applied to the record before us means that based on all of the information provided by the respondent, the respondent's inability to corroborate his stay in the refugee camp or otherwise "substantiate his story" does not foreclose a finding that he has met his burden.

## IV.  CONCLUSION

On the basis of the evidence of record, I conclude that the respondent has presented a credible account of his experiences in Mauritania, and of his flight from that country. I find that the respondent has met his burden and has set forth a persuasive account of the persecution that he suffered in Mauritania. *Matter of H-, supra; Matter of Mogharrabi, supra*. Moreover, in view of the respondent's testimony concerning the treatment of African-Mauritanians and the treatment to which he was subjected by Mauritanian soldiers, I believe that the actions of the Mauritanian authorities were motivated by the respondent's race and social group, thus amounting to persecution within the meaning of the Act. *See INS v. Elias-Zacarias*, 502 U.S. 478 (1992); *Matter of Mogharrabi, supra*. Accordingly, I would find that the respondent suffered persecution in Mauritania on account of his race and social group.

The Immigration and Naturalization Service has not filed any evidence which would establish that conditions in Mauritania have improved, or which would rebut the presumption that the respondent has reason to fear future persecution in Mauritania. *See Matter of H-, supra*, at 346. Accordingly, considering the absence of any adverse discretionary factors, I would grant the respondent's asylum claim and admit him to the United States as an asylee.