[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 5, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-15394
Non-Argument Calendar

_____

BIA No. A78-743-443

DIAN ZHENG JIANG,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

(May 5, 2005)

Before CARNES, MARCUS and FAY, Circuit Judges.

PER CURIAM:

Dian Zheng Jiang, a Chinese national, petitions for review of the Board of Immigration Appeals's ("BIA's") decision adopting and affirming the Immigration Judge's ("IJ's) order of removal and denial of his asylum, withholding of removal, and United Nations Convention Against Torture ("CAT") claims. Jiang argues on appeal that (1) the IJ failed to make a credibility determination supported by substantial evidence, (2) the IJ's finding that he Jiang did not qualify for withholding of removal or CAT relief was unsupported by substantial evidence, and (3) the IJ violated his due process rights by failing to consider his submitted evidence. For the reasons set forth more fully below, we deny Jiang's petition in part, and dismiss in part for lack of jurisdiction.

Jiang entered the United States sometime between January 1, 1998, and October of 1999, and was issued two different notices to appear, served on Jiang on November 21, 2002, charging Jiang with removability under INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), for being present in the United States without being admitted or paroled or arriving in the United States at a time or place other than as designated by the Attorney General.[1] On March 7, 2003, Jiang filed an application for asylum and withholding of removal, alleging persecution on account of his political opinion, and relief under CAT.

---

[1] The notices to appear contained differing information about Jiang's date of entry into the United States. Jiang's application for asylum listed his entry date as October 1999, which he repeated in his testimony at the hearing.

Jiang's application for asylum and withholding of removal alleged the following: (1) he would be subject to an excessive fine and severe punishment, including torture, if returned because he had illegally departed from China; (2) changed circumstances in the imminence of Jiang's fear of persecution was the reason his application was filed more than one year after his arrival in the United States; (3) Jiang's sister gave birth to a girl in 1995; (4) in 1997, his sister became pregnant again without seeking the government's permission, a violation of China's family planning laws; (5) his sister was found by the government and forced to undergo an abortion; (6) Jiang and his family were implicated for trying to hide his sister and opposing the family planning policy, prompting Jiang to flee China; and (7) China tortures, for intelligence reasons, repatriated citizens to extract information about the United States' asylum process.

Included in the administrative record was the State Department's China Country Report on Human Rights Practices, issued March 31, 2003. Relevant to Jiang's claim, the Chinese government implemented a new "Population and Family Planning" law on September 1, 2002, intending to standardize the implementation of the "birth limitation" policies in the local provinces. The new law required counties to use quotas or other measures to limit the total number of births in each county, as well as requiring married couples to apply for permission to have a second child if they meet the stipulated requirements of the local provinces, which

3

sometimes requires as many as four years between pregnancies. China's population control policy relies on education, propaganda, and economic incentives, as well as more coercive measures such as the threat of job loss or demotion, and those who have unapproved children are subject to a "social compensation fee." In at least one province, rules state "unplanned pregnancies must be aborted immediately." However, the central government policy formally prohibits the use of physical coercion to compel persons into abortion, and under the "state compensation law," citizens may sue officials who exceed their authority in implementing birth planning policy.

The record also contained an April 2003 "China Country Assessment," compiled by the United Kingdom for background purposes in the U.K.'s asylum process. That report stated, in relevant part, that "the act of exiting mainland China without permission is an offense. If this is the only unlawful act committed by the emigrant, then they are punished under Article 14 of the Law of the People's Republic of China on the Exit and Entry of Citizens (1981) and thus 'may be given a warning or placed in detention for not more than ten days by a public security organ.'" However, it was also noted that an overlapping article permitted fines to be levied at varying rates depending on the locality, and that "the Chinese Government does not generally mistreat returnees, unless the person has been deported to China more than once." That report also indicated a trend toward

4

using fraudulent claims and "hot button" issues to secure asylum. Finally, with respect to repatriation, the Chinese government accepts the return of its citizens who entered other countries illegally, generally fining them as punishment.

In addition, the 2003 report indicated that since the 1970's the Chinese Government has been implementing a range of family planning policies to deal with increased population and the effects of that increase on the country's resources and infrastructure. These policies are implemented through "education, propaganda, and a combination of incentives such as health subsidies and financial bonuses, and disincentives, such as additional taxes and legal discrimination. . . . Disciplinary measures against those who violate the policy include fines, withholding of social services, demotion, and other administrative punishments that sometimes result in loss of employment," as well as fines. The government opposes the use of force or coercion in implementing family planning regulations, although "officials have acknowledged that there have been instances of forced abortions and sterilizations." Finally, the report noted that the province of "Fujian" was "lax" in implementing the policy.[2]

The record also included a Canadian summary of a "fact-finding" mission

---

[2] It appears from the record that Jiang's parents live in Fuzhou City, Fujian Province in China, and Jiang's testimony was that, at the time his sister was forced to have an abortion in 1997, she was living with him and his parents. Thus, Fujian Province is specifically referenced where relevant.

indicating that Fujian is less effective in implementing the "one child" policy than other parts of China. It was surmised that local authorities "have lacked the capacity or will to effectively implement the . . . birth control policy." The report further stated that "[f]orced abortion and forced sterilization are reportedly not tolerated now, although local officials acknowledge there were problems with this in the past."

Finally, Jiang submitted a letter written by his parents, who wrote that Jiang had helped his sister resist several "village cadres" who sought to force his sister to have an abortion. As a result, they wrote that they feared for their son's well-being and smuggled him to the United States in August 1999. They requested that Jiang be granted asylum because, if returned to China, Jiang would be fined, beaten while interrogated, and imprisoned.

Jiang conceded to the allegations and charge of removability at his hearing. As noted above, Jiang indicated that he came to the United States in October of 1999, arriving in Los Angeles by boat. When asked about his problems with the Chinese government, Jiang stated that he was oppressed because of a family planning matter involving his sister, who gave birth in 1995 and then got pregnant again in 1997, a violation of the "one child" policy. Specifically, Jiang testified that government officials came to force his sister into having an abortion, and Jiang resisted by wrestling with the men, who then threatened him and told him that his

6

actions were not right with the government. Afterwards, his parents were worried because Jiang was the only son in the family, and his parents arranged for Jiang to exit China illegally. Jiang's sister was sent to the United States in 2000, and had a child while in the United States in 2001. She filed an application for political asylum because the birth of her second child was illegal in China, a claim that was denied and in the appeals process at the time of Jiang's hearing. Jiang did not testify at his sister's hearing.

As to the specifics of his own claim, Jiang testified that the reason his parents feared for his safety was because Jiang had disagreed with the government, which had tried to take his sister. Jiang stated that his parents informed him that the government had stopped by their house asking for Jiang, but not telling them the reason why they wished to speak with him. According to Jiang, his parents "figured out" that the government officials wished to see him because he had helped his sister resist being taken, and he feared that he would be "beaten up" and fined. He also feared returning to China because he had exited illegally. When asked how many "cadre" came to take his sister, Jiang stated that seven or eight people came to his parents' house, and that, in spite of his attempt to fight with them, he was not taken away or arrested. The IJ also questioned Jiang regarding why he had not previously filed for asylum if he truly believed that, at the time he arrived in the United States, he had violated Chinese emigration laws and would be

jailed, beaten, and fined, if returned to China. Jiang replied that he didn't know that his conditions met the requirement for political asylum.

Finally, Jiang testified that, if he were returned to China, he would be placed in jail and "beaten up" because "China is not as democratic as [the United States] so they usually beat up people." Jiang also testified that he had never personally violated China's family planning laws, and that the reason he had not filed for asylum earlier was because an attorney had told him that he did not meet the requirements.

The IJ issued an oral decision, and found that Jiang had failed to file a timely application for asylum, but for the purposes of the hearing, would apply the lower burden of proof required for asylum claims. First, the IJ questioned Jiang's claim that he would be arrested and tortured for his interference with the individuals who tried to take his sister for an abortion, taking issue with Jiang's testimony that seven to eight individuals came to his home, took his sister after he fought with them, but did not arrest him at that time. It also noted that (1) his sister's forced abortion should have qualified her as a refugee, but her claim for asylum was denied, and (2) even if his sister had been forced into an abortion, her claim could not be extended to him. Second, the IJ noted that the Fujian province has been lax in implementing family planning policies and that the authorities there, at least most recently, have been using incentives rather than coercion, which is not

8

tolerated. Lastly, the IJ found that the reports submitted showed that the Chinese government accepts repatriation of citizens like Jiang, who have illegally entered other countries, generally requiring the payment of a fine. Thus, Jiang had failed to show he had a well-founded fear of persecution or that there was a clear probability of persecution if he were returned to China. Neither had he shown that it was more likely than not that he would be tortured.

The BIA, in a written per curiam opinion, adopted and affirmed the decision of the IJ, stating that the IJ properly determined that Jiang's claim for asylum was not timely filed and that he had failed to meet his burden of proof for asylum, withholding of removal, and protection under the CAT.

On appeal, Jiang first argues that the IJ did not make a specific credibility determination, and, therefore, all of his testimony should be considered as truthful, citing the persuasive authority of Hartooni v. INS, 21 F.3d 336 (9th Cir. 1994).

"Credibility determinations . . . are reviewed under the substantial evidence test." D-Muhumed v. U.S. Attorney General, 388 F.3d 814, 818 (11th Cir. 2004). "The trier of fact must determine credibility, and this court may not substitute its judgment for that of the [IJ] with respect to credibility findings." Id. (citation omitted). Furthermore, "an adverse credibility determination alone may be sufficient to support the denial of an asylum application." Forgue v. U.S. Attorney General, No. 03-16394, slip op. at 1390 (11th Cir. Mar. 5, 2005). On the other

hand, "an adverse credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant. That is, the IJ must still consider all evidence introduced by the applicant." Id. (emphasis in original).

Here, the IJ "questioned" the account raised by Jiang concerning his role in interfering with the implementation of the "family planning" policies by fighting with seven or eight government officials who had come to take his sister for a forced abortion. Jiang claimed the men would torture or beat him if he returned, a claim which the IJ found not credible given that he was not arrested by any of the seven or eight men at the time Jiang confronted and interfered with them. As the IJ noted, fighting with government officials would "suggest the individuals would arrest him also. If they had any need for him he should have been arrested on the spot if it was such a violation."

The IJ also noted that the documents on the record established that the Fujian province has been lax in implementing the family planning policies and that the authorities there used incentive schemes and no longer tolerated coercive methods, such as forced abortions. It further gave weight to the reports from the U.K. and Canada showing that asylees who were returned to China were not subjected to mistreatment. The sum and substance of Jiang's claim relied solely on his subjective testimony that he would be beaten if he returned because China is not democratic and "they usually beat up people."

10

Therefore, we conclude that the IJ's skepticism regarding Jiang's claims is supported by substantial evidence as Jiang failed to provide any evidence other than his own subjective testimony. In any event, the IJ did not rest his decision solely on a finding that Jiang's claims lacked credibility - he also found that, because Jiang's claims were weak, he needed to bring forth corroborative testimony, and his failure to do so meant he could not meet his burden of proof.

We also conclude that Jiang's reliance on Hartooni is misplaced. In Hartooni, the Ninth Circuit persuasively held that "the IJ must have a legitimate articulable basis to question the petitioner's credibility, and must offer a specific, cogent reason for any stated disbelief. . . . Absent an explicit finding that a specific statement by the petitioner is not credible we are required to accept [his] testimony as true." Hartooni, 21 F.3d at 342. There, however, "the IJ failed to make clear findings about [the petitioner's] specific claims. The [IJ] put forth two separate general arguments, and then failed to explain which was dispositive of its conclusion." Id.

In the present case, the IJ explained why he "questioned" Jiang's claims regarding the incident wherein he fought with seven or eight government agents, and further went on the record to demonstrate why other record evidence shed doubt on the veracity of Jiang's story. Having explained why Jiang's claim appeared weak, the IJ ultimately found that the lack of any corroborative evidence

11

prevented Jiang from meeting any of the burden of proofs required for any of the forms of relief he sought. Therefore, unlike in Hartooni, the IJ's decision here explained why the petitioner's claims were weak and subject to doubt, but went on to deny Jiang relief because of his failure to provide any corroborating evidence to bolster his claim or to challenge the record evidence tending to refute his claims.

Thus, we conclude that the IJ's finding that Jiang's claim was not entirely credible was supported by substantial record evidence. However, because the IJ did not rest his decision solely on an adverse credibility finding, but rather on the failure of Jiang to offer corroborative evidence, we next turn to the IJ's determination that Jiang did not qualify for asylum, withholding of removal, or relief under the CAT.

Jiang next argues that the IJ's denial of Jiang's application for withholding of removal was not supported by substantial evidence, and that the IJ based his decision on conjecture, assumption, and speculation, failed to consider Jiang's testimony, and the decision constituted error as a matter of law by relying exclusively on country reports.

To the extent that the IJ's decision was based on a legal determination, review is de novo. Mohammed v. Ashcroft, 261 F.3d 1244, 1247-48 (11th Cir. 2001). The IJ's factual determinations are reviewed under the substantial evidence test, and we "must affirm the [IJ's] decision if it is 'supported by reasonable,

substantial, and probative evidence on the record considered as a whole.'" Al Najjar, 257 F.3d at 1283-84 (citation omitted). Thus, factual determinations "may be reversed by this court only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Adefemi v. Ashcroft, 386 F.3d 1022, 1026 (11th Cir. 2004).

An alien who arrives in or is present in the United States may apply for asylum. See INA § 208(a)(1), 8 U.S.C. § 1158(a)(1). The Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee." See INA § 208(b)(1), 8 U.S.C. § 1158(b)(1). A "refugee" is:

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. . . .

8 U.S.C. § 1101(a)(42)(A). The asylum applicant carries the burden of proving statutory "refugee" status. See Al Najjar, 257 F.3d at 1284. To establish asylum eligibility, the alien must, with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor, in this case group membership, will cause such

13

future persecution. 8 C.F.R. § 208.13(a), (b); <u>Al Najjar</u>, 257 F.3d at 1287. The INA does not expressly define "persecution" for purposes of qualifying as a "refugee." <u>See</u> INA § 101(a)(42). In <u>Gonzalez v. Reno</u>, 212 F.3d 1338, 1355 (11th Cir. 2000), however, this Court discussed other circuits' holdings that "persecution" is an "extreme concept," requiring more than "a few isolated incidents of verbal harassment or intimidation," or "[m]ere harassment." <u>Id.</u>

A showing of past persecution creates a presumption of a "well-founded fear," subject to rebuttal by the INS. 8 C.F.R § 208.13(b)(1). A "well-founded fear" of persecution may also be established by showing a reasonable possibility of personal persecution that cannot be avoided by relocating within the subject country. 8 C.F.R. § 208.13(b)(2)(i) & (ii). It is "well-established" that the well-founded fear inquiry contains both an objective and subjective component, i.e., the petitioner must be genuinely afraid and that fear must be objectively reasonable. <u>Al Najjar</u>, 257 F.3d at 1289. Furthermore, it is the petitioner's burden to present "specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution." <u>Id.</u> at 1287 (quotation and citation omitted).

The United States has also agreed, pursuant to Article 3 of the CAT, not to "expel, return (refouler) or expedite a person to another state where there are substantial grounds for believing that he would be in danger of being subjected to torture." The Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"),

14

Pub. L. No. 105-277, § 2242(a), 112 Stat. 2681 (1998) (codified at 8

U.S.C. § 1231). Section 2242 of FARRA incorporated CAT into domestic law.

To obtain withholding of removal under the CAT, the burden is on the applicant to

show that it is "more likely than not" that he will be tortured in the country of

removal. 8 C.F.R. § 208.16(c)(2). For purposes of CAT relief, the term

"torture"refers to the intentional infliction of severe pain or suffering, mental or

physical, "by or at the instigation of or with the consent or acquiescence of a public

official or other person acting in an official capacity" in order to intimidate or for

other proscribed purposes. 8 C.F.R. § 208.18(a)(1). Evidence relevant to the

assessment of eligibility for CAT relief includes, but is not limited to: (1) evidence

of past torture; (2) the viability of relocation as a means to avoid torture; (3) gross,

flagrant or mass human rights violations in the country of removal; and (4) other

relevant country conditions. See 8 C.F.R. § 208.16(c)(3).

Concerning Jiang's asylum claim, as a preliminary matter the BIA affirmed

the IJ's decision that Jiang had failed to file a timely application for asylum, a

decision we do not have jurisdiction to review. See Mendoza v. U.S. Attorney

General, 327 F.3d 1283, 1287 (11th Cir. 2003). However we still may consider the

IJ's determination that Jiang failed to meet the standard for withholding of

removal, which requires an alien to show that his life or freedom would "more

likely than not" be threatened upon return to his country because of, among other

15

things, his political opinion.  Mendoza, 327 F.3d at 1287; INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A).  This standard is more stringent than the "well-founded fear" standard for asylum, and if Jiang is unable to meet the well-founded fear standard for asylum, he is unable to qualify for withholding of removal.  See, e.g., All Najjar, 257 F.3d at 1292-93.

Here, the IJ proceeded to analyze Jiang's claims under the less stringent standard for asylum, and found that Jiang did not qualify.  We conclude that the administrative record in this case does not compel a reversal because substantial evidence supported the IJ's finding that Jiang did not suffer past persecution or have a well-founded fear of persecution based on his political opinion.  As noted above, the IJ had grounds to "question" Jiang's testimony, and Jiang's testimony was that his sister was forced to have an abortion in 1997 after violating China's "one-child" policy.  To help his sister resist, Jiang wrestled and fought the seven to eight government officials, and generally interfered unsuccessfully with their attempt to remove Jiang's sister for the purposes of performing a forced abortion.  Despite Jiang's actions, however, which Jiang stated were "not right with the government," Jiang was not arrested or harmed, nor did the government do anything more than "come looking" for him at his parents' home.  For more than one year after his actions, Jiang was apparently not harmed in any way, and eventually came to the United States in August 1999, where he lived for four years

16

before ever filing for asylum, after leaving China illegally.

The Country Reports[3] for China indicate that the Chinese government opposes coercive methods of implementing the "family planning" policies, and that Fujian, the province where Jiang's parents lived at the time Jiang's sister was allegedly forced to have an abortion and Jiang attempted to intervene, has been "lax" in enforcing the policies. Furthermore, Chinese citizens now have the right to sue government officials for exceeding their authority in implementing the policies. The record also indicated that the Chinese government accepts repatriated asylees who have left China illegally, punishing first time offenders with a fine.

Based on the foregoing, the IJ found that Jiang's uncorroborated testimony was insufficient to meet the less stringent standard for asylum, and, therefore, did not qualify him under the more stringent requirements for withholding of removal. The IJ pointed out that Jiang's fear of persecution was undercut by the fact that none of the seven or eight government officials saw fit to detain Jiang after he interfered with them. Moreover, supporting the IJ's skepticism is the fact that Jiang did not immediately flee China, but left more than one year after the 1997 incident.

Finally, while Jiang believes that he will be tortured if returned because he

_____

[3] This includes the State Dept. reports as well as the United Kingdom report and the Canadian report.

violated China's emigration policy, his only evidence in support of that contention is basically that China is not a democracy, and thus, they beat prisoners there. His application for asylum also includes a claim that repatriated citizens are tortured by the Chinese government for intelligence purposes in order to learn more about the United States' asylum process. This allegation contains no support in the record, and is undercut by the Country Reports indicating that a first-time violator, such as Jiang, would be accepted back with only a fine. As the IJ suggested, imposition of a fine in that context might, in fact, amount more to prosecution for violating Chinese law than persecution on the basis of political opinion. See, e.g., Abedini v. U.S.I.N.S., 971 F.2d 188, 191 (9th Cir. 1992) (persuasively holding that a possibility of prosecution for an act deemed criminal in Iranian society does not amount to persecution for an enumerated ground.).

Thus, we conclude that the combination of Jiang's weak, uncorroborated testimony, combined with the record evidence and the IJ's credibility determination, which was supported by record evidence, does not compel a reversal because a reasonable fact-finder could have found that Jiang failed to establish that he would more likely than not face persecution on the basis of his political opinion if returned to China. As noted above, well-founded fear requires both an objective and a subjective component, and Jiang offered no evidence other than his own subjective testimony to support his claims, testimony that the IJ

properly decided was weak as discussed supra. See Al Najjar, 257 F.3d at 1289.

Moreover, where, as here, the applicant's testimony is weak, there is a greater need for corroborative evidence. See In re Y-B-, 21 I&N Dec., 1136, 1139 (BIA 1998).

Accordingly, substantial evidence supported the IJ's determination that Jiang had not met his burden of proof for either asylum or withholding of removal, nor had Jiang proven that it was more likely than not that he would be subject to torture if returned to China.

Finally, Jiang argues that the IJ violated his due process rights by completely ignoring Jiang's submitted evidence, which prejudiced Jiang because had the evidence been considered, the IJ should have found it more likely than not that Jiang would be tortured or persecuted.

However, Jiang never argued to the BIA that the IJ violated his due process rights by ignoring submitted evidence. As a result, Jiang failed to exhaust his administrative remedies, and we lack jurisdiction to consider the argument here. Fernandez-Bernal v. Attorney General of the U.S., 257 F.3d 1304, 1317 n.13 (11th Cir. 2001). Accordingly, the issue will not be considered.

Based on the foregoing, we conclude that Jiang's petition should be denied because substantial evidence supported the IJ's decision. Jiang's petition for review of his due process and asylum claims are dismissed for lack of jurisdiction.

**PETITION DENIED IN PART, DISMISSED IN PART.**

19