[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 12, 2005
THOMAS K. KAHN
CLERK

No. 04-14166
Non-Argument Calendar

_____

BIA No. A96-110-317

XIU JIN CHEN,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

(May 12, 2005)

Before BLACK, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Xiu Jin Chen, through counsel, petitions us for review of the Board of Immigration Appeals' (BIA) decision, affirming the Immigration Judge's (IJ) order denying her application for asylum and withholding of removal. In her asylum application, Chen, a native and citizen of China, claimed that she left China because, in 1998, she and her boyfriend were not old enough to get married, but she became pregnant, was forced to have an abortion by Family Planning Officials (FPO), and feared that, if she returned to China, she would be sterilized and the FPO would arrest and fine her for leaving China without permission.

On appeal, Chen first argues that the IJ made an adverse credibility finding that was not supported by substantial evidence in the record, but instead, was based on speculation, conjecture, or unsupported personal opinion. According to Chen, the IJ failed to cite to any meaningful inconsistencies or implausibilities within her testimony or between her testimony and the evidence in the record. Chen asserts that the IJ improperly focused on points of non-correspondence between her testimony and earlier statements, rather than on the points of significant correspondence. Finally, Chen argues that her asylum application was supported by substantial evidence in the record, noting that victims of coercive family planning programs are recognized as refugees for purposes of political asylum.

When, as here, the BIA issues a summary affirmance of an IJ's decision, we review the IJ's decision. See Mendoza v. U.S. Atty. Gen., 327 F.3d 1283, 1284 n.1

2

(11th Cir. 2003).  We review the IJ's factual determinations under the highly deferential substantial evidence test, "'affirm[ing] the IJ's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole.'"  Forgue v. United States. Att'y. Gen., No. 03-16394 slip op. at 1389  (11th Cir. March 7, 2005) (quoting Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir.2001)). "[U]nder the substantial evidence test, we review the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Forgue, No. 03-16394, slip op. at 1389 (citation omitted). "Credibility determinations likewise are reviewed under the substantial evidence test." D-Muhumed v. United States Att'y Gen., 388 F.3d 814, 818 (11th Cir.2004) (citation omitted).  "The trier of fact must determine credibility, and this court may not substitute its judgment for that of the [IJ] with respect to credibility findings." Id. (citation omitted).

"[A]n adverse credibility determination alone may be sufficient to support the denial of an asylum application." Forgue, No. 03-16394, slip op. at 1390. On the other hand, "an adverse credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant. That is, the IJ must still consider all evidence introduced by the applicant." Id.  If, in addition to

3

her testimony:

> the applicant produces other evidence of persecution, whatever form it may take, the IJ must consider that evidence, and it is not sufficient for the IJ to rely solely on an adverse credibility determination in those instances. Further, the IJ must offer specific, cogent reasons for an adverse credibility finding. Once an adverse credibility finding is made, the burden is on the applicant alien to show that the IJ's credibility decision was not supported by 'specific, cogent reasons' or was not based on substantial evidence.

Id. (citations omitted). The weaker an applicant's testimony, the greater the need for corroborative evidence. Matter of Y-B-, 21 I&N Dec. 1136, 1139 (BIA 1998).

An alien who is present in the United States may apply for asylum. Immigration and Nationality Act (INA) § 208(a)(1), 8 U.S.C. § 1158(a)(1). Notwithstanding an exception, the Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee." INA § 208(b)(1), 8 U.S.C. § 1158(b)(1). A "refugee" is:

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

8 U.S.C. § 1101(a)(42)(A). The asylum applicant carries the burden of proving statutory "refugee" status. Al Najjar, 257 F.3d at 1284. The INA provides that:

> [a] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a

coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

INA § 101(a)(42)(B), 8 U.S.C. § 1101(a)(42)(B).

To establish asylum eligibility, the alien must, with specific and credible evidence, establish past persecution on account of a statutorily listed factor, or a "well-founded fear" that the statutorily listed factor will cause such future persecution. 8 C.F.R. § 208.13(a) and (b); Al Najjar, 257 F.3d at 1287. "The 'well-founded fear' inquiry . . . has both an objective and subjective component." Id. at 1289. Thus, "an applicant must demonstrate that his or her fear of persecution is subjectively genuine and objectively reasonable." Id. "The subjective component is generally satisfied by the applicant's credible testimony that he or she genuinely fears persecution." Id. "In most cases, the objective prong can be fulfilled either by establishing past persecution or that he or she has a 'good reason to fear future persecution.'" Id. (citation omitted).

As evidence of her eligibility for asylum and withholding of deportation, Chen provided her own statement, in which she chronicled the events leading up to her arrival in the United States. She indicated that she and her boyfriend, Ming Chen Gia, attempted to obtain a marriage certificate in January 1998, but the

government refused to issue one because Gia had not reached the legal age to marry. Chen noted that she and Gia nevertheless became engaged, and their parents hosted a private engagement party on January 26, 1998. Chen explained that she and Gia then began living together, and, in April, she discovered that she was pregnant. She reported that, on August 21, 1998, FPOs rushed into her house, pushed her to the floor, wrestled with her father, and forcibly took her to the hospital for an abortion, where, "after five hours suffering, the fetus was forced delivered, he was a boy." According to Chen, after the abortion (1) her father and husband were waiting outside for her, (2) she could not get out of bed for a month, (3) she "was infected by many gynecological diseases," and (4) she was fined. Chen further noted that the FPO intended to force her to have an IUD inserted, and, because she could not afford the fine and did not want the IUD, she left Fuzhou on September 26, 1998. Chen attested that, based on his fear that she would be sterile and that her medical expenses would become unmanageable, Gia left her in April 1999, taking all of his personal property with him. Chen indicated that, because the local officials in her home town could not find her, they "collapsed" her house and took all of her valuable property. She concluded that she left China on July 30, 2002, and feared that she would face a forced IUD insertion, sterilization, fines, and jail upon returning.

6

At her removal hearing, Chen testified that she was engaged to Gia in February 1998 and was persecuted by FPOs after she and Gia started living together and she became pregnant in April 1998. According to Chen, she and Gia were denied a marriage certificate in January 1998 because Gia, who was 21 at the time, had not reached the legal age to marry. Chen stated that she and Gia had an "engagement ceremony" in February 1998. The IJ did not "understand why [Chen] would ask for a marriage certificate . . . a month before [she] got engaged." Chen stated that they applied for the certificate because they planned to get married, and she did not know about the age requirement prior to applying.

According to Chen, in August 1998, seven FPOs entered her home and confronted her about getting pregnant without being married and without permission. The FPOs dragged Chen, she struggled, and, when she tried to get away, she fell to the floor. Her parents were home at the time, and her father tried to help by shouting and trying to wrestle Chen away from the FPOs. Chen described the following events: (1) the FPOs took her to a hospital in Changle City; (2) an ultrasound was performed while Chen was held down on an examination table; (3) she was taken to a surgery room and given an injection, after which she lost consciousness; (4) abdominal pain caused her to regain, lose, and then regain consciousness; (5) she "felt something was getting out of [her] body;" and (6) she saw the baby, who was a boy, and she cried. Chen indicated that the

7

nurse led her out of the surgery room, where her parents and Gia were waiting, and they hugged and cried.

According to Chen, on September 14, 1998, the FPO fined her for living unmarried with Gia. Chen did not pay the fine because she did not have the money to do so, and, on September 21, 1998, the FPOs came back to collect the money and to give her a notice instructing her to have an IUD inserted within a week. Chen stated that the FPOs smashed a table and some dishes and, when they left, her parents took her to Fuzhou to hide. Chen indicated that her parents remained in Fuzhou, but she did not want to return to China because she feared that she would be sterilized for not having the IUD inserted. While she was hiding in Fuzhou, neighbors informed Chen that the FPOs went to her abandoned home, broke the door, and damaged and stole her household items. According to Chen, she left her home on September 26, 1998, and learned about the damage to her home in October 1998. When asked how many times FPOs came to her home, referring to the September 14th and 21st incidents, Chen stated, "two times." When asked why she did not include the October incident, during which her things were broken, Chen stated that she thought that she was just being asked how many times they came to find her.

On cross-examination, Chen was asked why she did not testify about how her pregnancy and forced abortion had caused her to break up with Gia. Chen

8

explained that she had answered the questions that were asked and that, because she had gynecological problems, Gia was afraid that she would not be able to get pregnant. Chen was asked why, in her asylum application, she had indicated that she was engaged on January 26, 1998, but her testimony was that she was engaged in February 1998. Chen responded that she had applied for a marriage certificate in January, but was denied, and, only through the engagement, was she able to live with Gia with her family's consent. She was asked, "Your engagement was a very special day for you, wasn't it?", to which she replied, "Yes." Chen restated that, despite what her asylum application indicated, she was engaged in February, but had applied for the marriage certificate in January.

According to Chen, Gia was born on February 5, 1977, and was 21 at the time when they applied for a marriage certificate in January 1998. When asked why they did not go back to get a marriage certificate in February, after Gia turned 22, Chen stated, "well even 22 is not up to the age . . . they ask for 23." When asked about the incident during which the FPOs came to her home and destroyed and took property, Chen stated that they took "valuable" and "household stuff." When asked how Gia could have removed his belongings from the house in April 1999, as indicated in Chen's statement, Chen explained that Gia had picked up his own personal belongings, such as photographs and clothing, and the FPOs had only taken things of value. Chen testified that, from September 26, 1999, until

9

July 2002, she was in hiding in Fuzhou and dared not to go home. Chen stated that Gia's parents forced him to break their engagement because of Chen's gynecological problems and medical expenses. Chen was questioned about why, in her statement, she had indicated that only her father and Gia came to the hospital after her abortion, but her testimony was that her mother was there as well, to which she responded that they all came to the hospital.

The IJ asked her how long she was in South Africa before coming to the United States, and Chen responded, "Twenty something days." According to Chen, she took a bus from Fuzhou to Hong Kong and then flew to South Africa, where she followed "people," one of whom carried her documents. Chen stated that she did not apply for asylum in South Africa and that it was her plan to come to the United States. Chen stated that her family paid $20,000 to $30,000 for her to come to the United States.

When asked why she did not mention the fine during her airport interview, she stated that the INS agents "just took down the very simple statement" and asked her about persecution. When asked why she did not mention the fine during her credible fear interview, Chen stated, "Well I did say I was persecuted in China," and indicated that she just answered the questions as translated and could not "initiate some kind of answers." When asked why she did not tell the INS agents at the airport that the FPOs were looking for her and that her house was

10

destroyed, Chen stated that she just provided a simple statement and "didn't know [she] had to mention all that." The IJ asked how she could fail to mention, during both her airport and credible fear interviews, that her home was destroyed, as that was an event likely to instill fear, and Chen stated that she thought that she only needed to provide a simple statement and did not volunteer to answer questions that were not asked. Chen did not have any documentation to prove that Gia existed. Chen explained that some people took her passport after she had arrived in South Africa, and she did not have anything to document when she arrived there or how long she had stayed.

In addition to her testimony, Chen submitted a September 14, 1998, "Notice" sealed by the "Committee of Yingquian Village" ("the Committee"), indicating that Chen was being fined "RMB 18,000 Yuan" for (1) violating the birth control policy ("BCP"), (2) unmarried cohabitation, and (3) pregnancy. The notice warned that, if she did not pay the fine within seven days, she would be subjected to severe punishment and administrative sanctions. Chen also provided another sealed notice from the Committee, dated September 21, 1998, directing her "to take the IUD insertion on September 28" and advising that she would be fined "RMB 1,000 Yuan" if she failed to comply. Chen next included an August 21, 1998, "Certificate of Birth Control Operation of Changle City," signed by Doctor

11

Chen and sealed by "Exclusive Stamp of Sterilization Operation," certifying that she underwent an induced labor operation.

Chen's last two supporting documents were letters written by her mother and a friend from China. Chen's mother indicated that she had rushed to the hospital after the FPOs came to their home and forced Chen to have an abortion, and she and Chen both cried when Chen emerged from the operating room. Chen's friend, WanRu, indicated that FPOs continued to come to Chen's home looking for her and frequently asked WanRu for information. WanRu explained that, "on February 10th," she told FPOs that Chen had left for the United States, and the FPOs indicated that Chen would be "in trouble" when she came back to China. WanRu advised Chen never to come back, noting that, because Chen violated the BCP and left the country illegally, she would be subject to imprisonment, "suffering to death."

The IJ concluded that Chen's story was not credible, but "stopped short of finding it fraudulent." In rendering his oral decision, the IJ stated that the documentary evidence that Chen submitted had not been authenticated. The IJ stated that, although Chen's statement indicated that her parents held an engagement party for her on January 26, 1998, her testimony was that she did not become engaged until February 1998, but had requested a marriage certificate in January. Indicating that the "[c]redibility of the applicant is of extreme

12

importance," the IJ found Chen not credible, taking into account "the rationality, the internal inconsistency [], [and] persuasiveness of her testimony." The IJ stated that, despite the fact that Chen stated that she and Gia had an engagement party, the court was without benefit that Gia existed, and "[g]enerally if one would undergo a traditional marriage ceremony there would be pictures . . .[or] something to show such an event." The IJ found it unlikely that Chen and Gia were unaware of the minimum age to marry, that they would apply for a marriage certificate shortly before Gia became old enough to marry, and that they would not reapply once he reached the legal age. The IJ noted that, although Chen stated that both she and Gia feared that she would be sterile as a result of the abortion, there was no documentation to indicate that she had undergone any treatment or examination in the United States to determine whether the gynecological problems that she complained of caused her to become sterile.

Noting that the State Department Report and the Assessment both indicated that, when a child is born to parents who have not yet reached the legal age to marry, the child still may be registered, but social benefits may be forfeited, the IJ concluded that Chen had not been forced to undergo an abortion. The IJ also pointed out that the State Department Report and Assessment acknowledged the existence of fraudulent documents. The IJ explained that, according to the Assessment, family planning authorities used incentive schemes, rather than forced

13

abortions and sterilizations. The IJ found it telling that Chen failed to report the alleged fine and the alleged destruction of her home during her airport and credible fear interviews, and he did not find compelling her explanations for failing to do so.

The IJ found that Chen had "not shown how long she had stayed in her country," and it was her burden to show that she was not firmly resettled. According to the IJ, Chen also failed to show that she had not received safe haven in South Africa, or that she had arrived in the United States on a "direct flight from persecution." The IJ noted that Chen had failed to provide evidence of her (1) arrival from South Africa, or (2) "traditional marriage engagement ceremony[,] which is something that is generally well documented by the families." The IJ reasoned that the documents submitted by her mother seemed to be an effort to "embellish or create an asylum application." The IJ also found it incredible that, if Chen left her home in October 1998, FPOs still would be looking for her. The IJ concluded that, in light of the State Department Report and the Assessment, Chen had failed to meet her burden of establishing that she had a well-founded fear of persecution based upon a showing of past persecution. The IJ determined that Chen had failed to provide credible, direct, specific evidence that she ever violated the family planning policy, and the errors and omissions suggested that her claim was a "work in progress that developed as the documents came in." The IJ found

that Chen's explanation as to why she failed to mention events that would give rise to fear in the average person were "incredible and not plausible." The IJ found that Chen had failed to establish (1) a fear of persecution, and denied her application for asylum, (2) clear probability of persecution, and denied withholding of removal, and (3) a likelihood that she would be tortured upon return to China, and denied CAT relief.

In this case, the IJ found that Chen was not credible because: (1) the documents that she provided to support her claim were not authenticated, and the Assessment and State Department Report acknowledged that such documents sometimes are fraudulent; (2) she did not provide any documentation or pictures to support that Gia existed; (3) it was implausible that she would not know of the minimum age requirement for marriage or that she and Gia would not reapply for a marriage certificate after finding out that Gia only was one month away from the legal age requirement; (4) there was no documentation to indicate that she had undergone any medical treatment in the United States, despite her claims that she feared that the abortion had left her sterile and she suffered from gynecological problems; (5) Chen was unable to explain adequately, and there was no evidence to confirm, how she had arrived in the United States; (6) FPOs would not continue returning to her abandoned home to look for her four years after she fled; and (7) during her initial interviews with the INS, she had failed to mention events,

including the destruction of her home and fine, that would give rise to fear in the average person, or otherwise would be important to her claim. (See AR at 34-41). The IJ further found that the State Department Report and Assessment undercut Chen's claim.

Because portions of Chen's testimony, which went to the heart of her claim, were vague, inconsistent, and contrary to the evidence in the record, the IJ's adverse credibility finding is supported by substantial evidence and we DENY Chen's petition.

**PETITION DENIED.**