[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-10182
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 26, 2005
THOMAS K. KAHN
CLERK

Agency No. A95-264-583

LUCIO SILVA-SIEGER,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(September 26, 2005)

Before CARNES, MARCUS and FAY, Circuit Judges.

PER CURIAM:

Lucio Silva-Sieger ("Silva"), a Colombian national proceeding through

counsel, petitions for review of the Board of Immigration Appeals's ("BIA")

affirming an Immigration Judge's ("IJ") order of removal and denial of his asylum

and withholding of removal claims. He argues that his due process rights were violated and that substantial evidence supported his asylum claim based on past persecution and well-founded fear of future persecution on account of his political opinion. For the reasons set forth more fully below, we deny Silva's petition.

According to his notice to appear, Silva entered the United States on May 20, 2000, as a non-immigrant visitor for pleasure with authorization to stay until October 15, 2001, and was charged with removability under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), for being present in the United States for a longer time than permitted. On May 31, 2002, Silva filed an application for asylum and withholding of removal, alleging persecution on account of his political opinion, religion, and membership in a particular social group. Silva stated that he feared returning to Colombia because he believed that he would be harmed by "the guerilla" or groups at the margins of the law for not sharing their ideology. He indicated that he had been a member of the "Liberal Party" since January 1999, and that his sister continued to participate in Liberal Party activism. Silva admitted that his application for asylum was filed more than one year after his arrival in the United States and explained that he was filing late "because of the radical changes in human rights and country conditions in Colombia."

Silva also submitted an addendum to his application stating the following. Silva was born in Bucaramanga and, after his parents separated, lived with his

2

father and step-mother in Cucuta.  After high school, his family moved back to Bucaramanga, and two years later, Silva moved to Bogota to attend college.  While visiting his family on vacation to Bucaramanga, Silva became involved with the "Tibet Movement" of the Liberal Party, participating in political campaigns and community service.  Beginning in July 1999, Silva began to receive threats from the FARC[1] telling him not to visit his family ranch, but he ignored the threats and continued to be active with the Liberal Party in Bucamaranga.  Silva continued receiving threats, through phone calls to his house or sent through employees of the farm (ranch), until he was warned that, if he continued collaborating with the Liberal Party, he would be assassinated like three of his uncles.  These threats led Silva to abandon his activities with the Party, but the threats continued, causing him to flee to the United States.  In August 2000, another uncle was assassinated.

Also submitted were several death certificates, all issued on April 16, 2002, the first in the name of Gonzalo Martinez, whose cause of death was a cerebral laceration on September 21, 1986.  A second death certificate was included for Jose Antonio Martinez, whose cause of death was cardiopulmonary stroke on January 22, 1991.  Third, a death certificate for Gustavo Martinez was included, indicating that Martinez died of cardiopulmonary stroke/severe cerebral shock on November 6, 1992.  Finally, Victor Martinez was killed on August 21, 2000, due to

---

[1] Revolutionary Armed Forces of Colombia

"violent death."

The record also included the State Department's Colombia Country Report on Human Rights Practices for 2001. In it, the FARC and several other guerilla movements are described as commanding an estimated total of 21,645 full-time guerillas, operating in more than 100 semi-autonomous groups that took action in nearly 1,000 of Colombia's 1,097 municipalities. All of these groups, including FARC, attack citizens through killings, forced disappearances, mutilation of bodies, attacks on churches, attacks on hospitals, attacks on ambulances, and executions of patients in hospitals. While the FARC's activities tend to target police officers, the military, and civilians at large, the report indicated that guerilla groups, including the FARC, were responsible for 458 political killings from June 2000 to June 2001.

The FARC's tactics also include kidnaping, tortures, and the forced recruitment of children as young as 10 years old. The Colombian government did report, however, capturing three times as many paramilitaries in 2001 as compared to 2000, although these guerilla and paramilitary groups clearly remain a grave threat to security.

The 1997 State Department "Colombia Profile of Asylum Claims & Country Condition" reported that "[t]hose fleeing guerrilla or police/military harassment or threats in conflictive zones usually are able to find peaceful residence elsewhere in

4

the country." Moreover, that same report indicated that guerrilla movements are fragmented, with little organized cooperation among the groups, making internal relocation a viable option for many candidates.

Silva also supplemented the record with a letter from Tiberio Villareal Ramos, director of the "Tiberista Movement," stating that, due to Silva's participation in campaigns, Silva had some conflicts with paramilitaries and guerillas, forcing him to leave the country. Another letter, purporting to be from his mother, Emely Martinez Cardozo, declared that, as of July 11, 2003, she received phone threats against her son, Silva, who worked in the Liberal Party and that, two years earlier, her brother, Victor Martinez Cardozo, had been removed from a farm by an unknown group and assassinated.

Silva admitted to the allegations and conceded the charge of removability. At his hearing, Silva argued that his application was filed late because he initially came to the United States for a "wait and see" period, but after threats continued and his uncle was killed, he became convinced that he would never be safe in Colombia. He admitted, however, that he came to the United States on May 20, 2000, and his uncle was killed in August 2000, but his application was not filed until nearly two years later, on April 3, 2002. He further argued that he received an extension of his visa for six months, and that the regulations and/or law stated that periods of time while a person is present and validly in the United States do

not count toward the filing deadline. Silva testified that he was waiting for the situation to get better in Colombia, and then became ill, requiring hospitalization in March 2002.

Prior to coming to the United States, Silva lived between Bogota and Bucaramanga in Colombia, alternating time between living with his mother in Bogota, and with his father and step-mother in Bucaramanga. Silva worked at a bank and a hotel and received a degree in financial administration in 1997. In 1995, Silva joined the "Tiverista Movement,"led by Tiberio Villareal and affiliated with the Liberal Party. Silva worked on political campaigns and social health issues financed by the Tiverista Movement. Silva explained that, while in Bucamaranga, he attended meetings to plan strategies for political candidates. When there were no pending political campaigns, the meetings would focus on social work and health. During one campaign for a Liberal candidate, Silva publicized the candidate by distributing pieces of paper with the candidate's name. In 1997, Silva again helped a political candidate in his reelection campaign for a local "state assembly" position. Silva's involvement with the Liberal Party continued until November 1999.

When asked why he joined the Liberal Party, Silva explained that he was against allowing groups "outside the law" from taking power and was for the

spread of democracy. Specifically, he was against the FARC, ELN,[2] and the paramilitary. Silva then testified that, on July 4, 1999, while he was at his father's home, he received a threat communicated by telephone. Silva was not home at the time of the call, and his father received the call, in which someone said that, if Silva continued to work with Liberal movement, he would be kidnaped and killed. Silva was in Bogota with his mother at the time, and his father called to inform him of the threat, which made Silva afraid because three of his uncles had previously been assassinated.

When asked to explain the deaths of his uncles, Silva testified that the first one killed was Gonzalo Martinez who, in September 1986, was killed by the FARC after he received threats. The next uncle, Jose Martinez, was assassinated in January 1991 by the FARC, apparently for speaking out against the "guerillas" to his students. The third uncle, Gustavo Martinez, was killed in November 1992 after being kidnaped and tortured. Gustavo was found with a bullet through his head and he had been castrated, had his fingernails removed, and had his eyes pulled out. After receiving the threatening phone call, Silva informed his leader (Villareal) and continued to engage in political activity. Villareal told him to wait and see if the threats became stronger.

In August 1999, Silva received a second threatening phone call, again at his

---

[2] National Liberation Army

father's home in Bucaramanga, telling him to abandon the Liberal Party or risk being killed. He testified that he became afraid because he felt that he could not do what he wanted to do and thought the "guerillas" would kill him. Silva told Villareal about the call, and he told Silva to reduce the amount of his political activity. Silva did not, however, tell the police about the calls because he did not have a name and "the police in Colombia just [don't] do anything." Silva received another threat in October 1999, this time communicated to him through a farm worker, who called Silva's father to inform him that the FARC had been at the farm and threatened to kill Silva if he did not cease his Liberal Party activities. The threat was made in Bucamaranga, but Silva was in Bogota at the time.

In November 1999, Silva traveled to Bucamaranga, discussed the threats with his father, brothers, and step-mother, and decided to withdraw from political activity altogether. Silva then returned to Bogota to live with his mother, where he received no threats. His father, however, continued to receive one phone call from the FARC per month in Bucamaranga, telling his father that they knew where Silva was and wanted to ensure that Silva did not return to the Liberal Party. Eventually, Silva decided to leave Colombia because he did not feel safe, and was concerned that the FARC had been able to locate him in Bogota.

Silva feared being returned to Colombia because he believed that the FARC would kill him. He testified that his father has continued to receive calls from the

FARC even though Silva has been in the United States, and that in August 2000, another uncle, Victor Martinez, was killed by the FARC after receiving and ignoring threats. Silva then testified that he had decided to file his application before his visa expired, near the end of October 2001.

On cross-examination, Silva testified that he received his Colombian passport in January 1996, and at that time, planned on traveling to Ecuador and through South America. Silva also traveled to Bolivia, Peru. Silva returned to Ecuador several times in 1997, and testified that he had friends there. In 1998, he traveled to Argentina, and also spent brief amounts of time in Chile, Paraguay, Uruguay, and Brazil. Silva obtained his visa to come to the United States in 1998 while traveling in Ecuador. After obtaining his visa, he traveled to Argentina, Uruguay, and Paraguay before coming to the United States.

Silva then testified that he never received a phone call from the guerillas while he was at his mother's house in Bogota, nor had he been visited by guerillas at his mother's home there. Furthermore, he had never had a face-to-face confrontation with the guerillas, the guerillas had never visited his father's home in Bucamaranga, and the telephone number at his father's home was never changed. No physical harm was inflicted on Silva by guerillas. Silva was aware that Colombia had a national police, an army, an Administrative Department of Security, and an anti-kidnaping force called Gaula, none of which he contacted

9

regarding the threats. Silva further testified that he had never been arrested in Colombia or anywhere else, never been interrogated or detained, and had never been convicted of a crime.

With respect to his uncles, Silva never participated in any activities with Gonzalo Martinez, who was a member of the Conservative, not Liberal Party. The guerillas had asked Gonzalo for a war tax. He also had never participated in any activities with his uncle, Jose Cardoza, who also had been requested to pay a war tax. Silva clarified that he had not been politically active at the time his uncles were assassinated, and then testified that his uncle Gustavo Cardoza was required to pay a war tax as well. The same was true for his uncle Victor Martinez.

The IJ then questioned Silva regarding his relationship with his biological mother, who abandoned Silva when he was three years old, but rekindled the relationship when Silva turned 18. Silva was also questioned regarding how, if he was living in Bogota from 1994-1999, he was able to frequently engage in political activities in Bucamaranga, which was at least a 10-hour bus ride away. Silva testified that, Monday through Friday, he lived and worked in Bogota, but would travel to Bucamaranga on Friday nights and return in the early morning hours to begin work back in Bogota on Monday or Tuesday. He said that he traveled a minimum of once every 15 days, and sometimes every weekend if the movement required it. When there were no political campaigns nearby, Silva would use his

10

weekends and vacation time to travel to different countries and to undertake "social geared activities."

In January 1999, Silva was not working, and received cash from the "Tiverista Movement" in order to support himself. Silva was also asked about the death certificates of his uncles which, despite Silva's assertion that his uncles were killed by bullets, listed such causes of death as "cerebral laceration." Silva explained that doctors in Colombia are pressured by guerilla members not to put the actual causes of death. Jose Martinez's death certificate listed cardiorespiratory problems as the cause of death, but Silva explained that this was not true and a doctor had informed Silva's brother that "this is what I [had] to put in there." Gustavo Martinez's death certificate, listing cardiopulmonary stroke and severe cerebral shock was correct, although it did not list the "whole truth" because the doctors feared becoming a target of the guerillas.

Next, the IJ challenged Silva to explain how it could accept these documents as proof that Silva's uncles were assassinated, and further asked why Silva had not produced police reports, investigations, or news articles regarding the deaths of his uncles and whether those deaths were attributable to the FARC. Silva's response was that "[e]verything in Colombia is based on the law of silence." Silva was next asked why he came to the United States instead of Ecuador, Brazil, Argentina, Paraguay, or Uruguay, and he replied that he felt safer here. When presented with

11

his statement that he hadn't originally come to the United States to seek asylum and asked why he couldn't "wait it out" in Ecuador or Argentina, Silva replied that it was a known fact that the guerillas cross borders throughout countries in South America.

Silva then argued that the time in which he needed to file his asylum application should be tolled because of all the "disabilities" that occurred after his arrival in the United States. Given all of extenuating circumstances, Silva argued that his application was filed in a reasonable amount of time. The IJ responded that the regulation on which Silva was purporting to rely dealt with claims of ineffective assistance of counsel. In closing, Silva argued that his claim was one of "imputed political opinion, perhaps direct political participation." His objective fear, he argued, was based on the threats he received as well as the fate of several of his family members, who were killed in the same area in which he used to be politically active. Finally, he requested that his health be taken into consideration.[3]

The government argued that Silva had not met his burden of showing past persecution because several phone calls were insufficient proof. It argued that there was not even evidence to suggest that his uncles had been killed by guerilla members, as the death certificates contradicted Silva's testimony. Silva was never

---

[3] The record includes a letter from a "Dr. Campo," indicating that Silva suffers from a medical condition requiring extensive treatment.

harmed by any guerillas, and at no time did any guerilla member ever go to either his mother's home in Bogota or his father's home in Bucaramanga. The government also pointed out that Silva, upon arriving in the United States, did not seek relief from INS because he was afraid, but chose instead to extend his visa to remain a visitor. It further argued that Silva had never attempted to relocate and traveled to numerous countries during the time in which Silva claimed to be receiving threats and continued to return to Colombia. Finally, the government argued that Silva's family continues to live in the same area where his uncles were supposed to have been assassinated, making Silva's story implausible.

The IJ issued an oral decision and first determined that Silva's application for asylum should be overlooked because he failed to establish exceptional circumstances to justify filing his application more than one year after his arrival in the United States. It further rejected Silva's argument that 8 C.F.R. § 208.4(a)(4)-(5) applied to his case because Silva had not demonstrated ineffective assistance of counsel as required. However, assuming that his application was timely, the IJ found that Silva had failed to introduce sufficient evidence to show past persecution or a well-founded fear of future persecution. If further found that "the respondent's testimony was not sufficiently detailed, consistent or believable." The IJ had "serious concerns with respect to the respondent's credibility about the means and manners of the deaths of [his] uncles," in light of the inconsistency

13

between the death certificates and Silva's testimony. Even if the uncles had been killed by guerillas, the IJ found that there was no connection between Silva and his uncles' deaths because he had never engaged in any political activities with those uncles and the reason for their killings might have been a refusal to pay a war tax, which was not requested of Silva.

Furthermore, the IJ found that all of the threats, to the extent they occurred (because of Silva is little, if any, corroborative evidence), all occurred in Bucaramanga, Silva's political activities were not significant, consisting of meetings and distributing pamphlets, and did not present any testimony indicating that the leader of the movement had suffered harm or been targeted for any form of persecution or threats. It further found it implausible that, after Silva had discontinued his political activities, he continued to receive threatening phone calls at his father's home. Next, the IJ found that Silva had failed to establish country-wide persecution and that Silva testified that he had no calls or visits from guerillas while living in Bogota and, therefore, could not understand why Silva could not live outside the Bucamaranga area of Colombia. Because Silva could not meet his burden for asylum, the IJ found that he could not meet his burden for withholding of removal either. Finally, the IJ denied Silva CAT relief, but granted him voluntary departure.

Silva appealed the decision to the BIA, arguing that the IJ improperly (1)

14

denied him withholding of removal; (2) determined that his asylum application was not timely filed and that he did not meet an exception to the filing deadline; and (3) found that he had not been persecuted. The BIA issued a per curiam opinion dismissing Silva's appeal. It found that, even if Silva's application was timely filed, Silva had failed to show past persecution. For the same reasons as the IJ, it found that Silva had failed to show that internal location was unreasonable given the location of the threats and the level of his political involvement. Therefore, Silva failed to meet his burden for either asylum or withholding of removal. Silva filed a motion to reconsider arguing, inter alia, that the BIA had failed to address the IJ's errors regarding the one-year filing deadline, which the BIA denied. No petition for review was filed for that decision.

We will review only the Board's decision, except to the extent that it expressly adopts the IJ's opinion. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001) (citation omitted). Insofar as the Board adopts the IJ's reasoning, we will review the IJ's decision as well. Id. (citation omitted).

### I. Silva's Due Process Claim

On appeal, Silva first argues that the BIA violated his due process rights by failing to correct the IJ's misstatement of law regarding exceptional circumstances sufficient to justify filing a late asylum application. In particular, he challenges the IJ's determination that, in order to show extraordinary circumstances, Silva had to

15

show ineffective assistance of counsel. He further argues that the IJ's error prejudiced Silva's case because the IJ assumed early in the proceedings that Silva's asylum application would be denied. Next, Silva argues that his due process rights were violated because the BIA's opinion was not reasoned and amounted to a single-member "rubber stamp" of the IJ's decision. He also argues that his appeal should have been assigned to a three-judge panel of the BIA.

We conclude that Silva's due process argument is without merit. We review constitutional challenges de novo. Lonyem v. U.S. Attorney Gen., 352 F.3d 1338, 1341 (11th Cir. 2003). "To establish due process violations in removal proceedings, aliens must show that they were deprived of liberty without due process of law, and that the asserted errors caused them substantial prejudice." Id. at 1341-42. With respect to Silva's first argument, the gravamen of his complaint is that the BIA's opinion was unreasoned and amounted to affirmance without an opinion in violation of his due process rights. First, Silva mischaracterizes the BIA's opinion, which was not an affirmance without opinion. See 8 C.F.R. 1003.1(e)(4)(ii) (describing the procedure for issuing an affirmance without opinion). Second, for the reasons discussed more fully in part II of this opinion, even if Silva had proven a due process violation, we conclude that he cannot show substantial prejudice because, as both the BIA and the IJ found, even if Silva's application had been timely filed, he still could not meet his burden of proving he

16

qualified for asylum.

Lastly, to the extent that Silva argues that the BIA merely "rubber-stamped" the IJ's decision and that the case was improper for a single BIA member to affirm, the argument is without merit. Pursuant to 8 C.F.R. § 1003.1(e)(5), if a "Board member to whom an appeal is assigned determines, upon consideration of the merits, that the decision is not appropriate for affirmance without opinion, the Board member shall issue a brief order affirming, modifying, or remanding the decision . . . unless the Board member designates the case for decision by a three-member panel." 8 C.F.R. § 1003.1(e)(5). A case may only be assigned to a three-member panel if the case presents one of the circumstances listed in 8 C.F.R. §§ 1003.1(e)(6)(i)-(vi). Silva purports to rely on §§ 1003.1(e)(6)(iv)-(v), which permits a three-member panel to review cases raising issues of either national import or the need to review a clearly erroneous factual determination by an immigration judge. See 8 C.F.R. §§ 1003.1(e)(6)(iv), (v). However, for the reasons set forth below, in part II, the IJ's factual findings were not clearly erroneous, and Silva fails to demonstrate the national importance of his case.

## II.  Whether Substantial Evidence Supported Silva's Asylum Claim

Silva argues that he provided evidence of both past persecution and a well-founded fear of future persecution and his application for asylum and withholding

17

of removal should have been granted.[4]

To the extent that the IJ's decision was based on a legal determination, review is de novo. Mohammed v. Ashcroft, 261 F.3d 1244, 1247-48 (11th Cir. 2001). The IJ's factual determinations are reviewed under the substantial evidence test, and we "must affirm the [IJ's] decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Al Najjar, 257 F.3d at 1283-84 (citation omitted). Thus, factual determinations "may be reversed by this court only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Adefemi v. Ashcroft, 386 F.3d 1022, 1026 (11th Cir. 2004).

An alien who arrives in or is present in the United States may apply for asylum. See INA § 208(a)(1), 8 U.S.C. § 1158(a)(1). The Secretary of Homeland Security or the Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee." See INA § 208(b)(1), 8 U.S.C. § 1158(b)(1).[5] A "refugee" is:

---

[4] Silva does not raise any challenge in his brief to the denial of relief under the CAT and, thus, that issue is deemed abandoned. Sepulveda v. U.S. Attorney Gen., 401 F.3d 1226, 1228, n.2 (11th Cir. 2005).

[5] Pursuant to the REAL ID Act of 2005, INA § 208(b)(1), 8 U.S.C. § 1158(b)(1), was amended to add "The Secretary of Homeland Security or the Attorney General" as if enacted on March 1, 2003. See Pub. L. 109-13, 119 Stat 231 (May 11, 2005), Division B, Sec. 101, 8 U.S.C. § 1158(b)(1) and note (1).

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. . . .

8 U.S.C. § 1101(a)(42)(A). The asylum applicant carries the burden of proving statutory "refugee" status. See Al Najjar, 257 F.3d at 1284. To establish asylum eligibility, the alien must, with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor, in this case group membership, will cause such future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287. The INA does not expressly define "persecution" for purposes of qualifying as a "refugee." See INA § 101(a)(42), 8 U.S.C. § 1101(a)(42). However, we have discussed other circuits' holdings that "persecution" is an "extreme concept," requiring more than "a few isolated incidents of verbal harassment or intimidation," or "[m]ere harassment." Sepulveda v. U.S. Attorney Gen., 401 F.3d 1226, 1231 (11th Cir. 2005). "[A]n applicant must demonstrate that his or her fear of persecution is subjectively genuine and objectively reasonable." Al Najjar, 257 F.3d at 1289.

A showing of past persecution creates a presumption of a "well-founded

19

fear," subject to rebuttal by the INS. 8 C.F.R. § 208.13(b)(1). A "well-founded fear" of persecution may also be established by showing a reasonable possibility of personal persecution that cannot be avoided by relocating within the subject country. 8 C.F.R. § 208.13(b)(2)(i) & (ii). It is "well-established" that the well-founded fear inquiry contains both an objective and subjective component, i.e., the petitioner must be genuinely afraid and that fear must be objectively reasonable. Al Najjar, 257 F.3d at 1289. Furthermore, it is the petitioner's burden to present "specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution." Id. at 1287 (quotation and citation omitted).

We have further stated that "where the alleged persecutors are not affiliated with the government, it is not unreasonable to require a refugee who has an internal resettlement alternative in his own country to pursue that option before seeking permanent resettlement in the United States, or at least to establish that such an option is unavailable." Mazariegos v. Office of U.S. Attorney General, 241 F.3d 1320, 1327 (11th Cir. 2001).

First, to the extent that Silva is arguing that his application for asylum was filed within the one-year deadline or subject to an exception found in 8 C.F.R. § 208.4(a)(4)-(5), we lack jurisdiction to review that determination. See Fahim v. U.S. Attorney Gen., 278 F.3d 1216, 1217 (11th Cir. 2002) (holding that federal courts are without jurisdiction to review the Attorney General's decision as to

20

timeliness of an asylum request); see also Vasile v. Gonzalez, No. 03-3337 (7th Cir. Aug. 9, 2005) (persuasively holding that, even in light of the REAL ID Act's jurisdictional review provisions, the decision whether to extend the deadline for filing asylum claims is discretionary and, therefore, not subject to review). However, as the BIA and the IJ found, even were Silva's application timely, he could not meet his burden of proving he qualified for either asylum or withholding of removal. Their decisions are supported by substantial evidence.

Silva's own testimony indicated that he had never had any direct contact with any guerillas. The only threats he received were phone calls to his father's home in Bucamaranga, and at no point was he ever visited or called in Bogota. A handful of phone calls threatening Silva without more does not rise to the "extreme concept" required to demonstrate past persecution. Persuasive authority from other circuits indicates that "[t]hreats alone generally do not constitute actual persecution; only rarely, when they are so immediate and menacing as to cause significant suffering or harm in themselves, do threats per se qualify as persecution." Vatulev v. Ashcroft, 354 F.3d 1207, 1210 (10th Cir. 2004); see also Mendez-Gutierrez v. Ashcroft, 340 F.3d 865, 869 n.6 (9th Cir. 2003); Boykov v. I.N.S., 109 F.3d 413, 416 (7th Cir. 1997). Silva was never harmed, nor was he ever personally confronted by anyone claiming to be a FARC member. We, therefore, conclude that the record supports the BIA's and IJ's determination that

21

Silva failed to prove that he suffered past persecution.

As to a well-founded fear of future persecution, Silva's testimony failed to establish that his fear was objectively reasonable. Even when he was participating in political activities, his activity was limited to low-profile activity such as distributing papers with a candidate's name on them. He had never been personally confronted by the guerillas and, notably, there was no testimony suggesting that the leader of the movement to which Silva was a member had been threatened or otherwise harmed by anyone claiming to be a guerilla. Moreover, Silva stopped participating in politics and, therefore, it would seem anomalous for anyone to want to persecute him on the basis of his political activity once that activity ceased. To the extent he relies on the deaths of his uncles, even if Silva had properly proved that the deaths were the result of assassinations by guerillas, Silva failed to demonstrate any connection between the political beliefs and activities of those uncles and the activities of his own. Silva admitted not having associated with the uncles in their political activities and, therefore, Silva lacked any detailed, specific evidence to show he would be singled out for persecution because his uncles were. Where the applicant's testimony is weak, there is a greater need for corroborative evidence. See Yang v. U.S. Attorney Gen., 03-16068, manuscript op. at 6 (11th Cir. July 29, 2005), citing In re Y-B-, 21 I&N Dec., 1136, 1139 (BIA 1998).

22

Finally, Silva failed to demonstrate that internal relocation was not an available option. His own testimony established that he was never contacted in Bogota, and that all of the threats occurred in Bucamaranga at his father's home. Thus, we conclude that the BIA's and IJ's conclusion, that Silva's low-profile political activity coupled with the localized nature of the threats made internal relocation a reasonable option, is supported by substantial evidence in the record.

Lastly, an alien seeking withholding of removal under the INA must show that his life or freedom would "more likely than not" be threatened upon return to his country because of, among other things, his political opinion or membership in a particular social group. See Mendoza v. U.S. Attorney Gen., 327 F.3d 1283,1287 (11th Cir. 2003); INA § 241(b)(3), 8 U.S.C. § 1231(b)(3). This standard is more stringent than the "well-founded fear" standard for asylum; thus, because Silva was unable to meet the well-founded fear standard for asylum, he is unable to qualify for withholding of removal.

In sum, we conclude that the BIA and IJ's opinions finding that Silva was unable to meet his burden of proof for asylum or withholding of removal are supported by substantial evidence. We further conclude that Silva, to the extent he even raised a due process claim, cannot show substantial prejudice and, therefore his due process claim is meritless. Accordingly, we deny the petition.

**PETITION DENIED.**

23